## THE SCANDINAVIA,

## THE JOAQUIN MUMBRU,
and four other cases.

(District Court, S. D. New York. July 10, 1918.)

1. Collision ⟨⟩95(1)—Vessel being towed down stream by tugs, without steam except for steering purposes was vessel "under way" (Inland Regulations of 1897, § 1 [Comp. St. § 7873]).

Steamer being towed down stream by tugs without any steam on her boilers, except for steering purposes, was a vessel "under way," within the preliminary definition of Inland Regulations of 1897, § 1 (Comp. St. § 7873).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Under Way.]

2. Collision ⟨⟩75—Letter of Secretary of Commerce to Secretary of the Navy, overruling prior order of Steamboat Inspection Service and advising that steam vessels, when towed, should not carry white masthead light, is not controlling, though entitled to great weight.

Letter of Secretary of Commerce to Secretary of the Navy, advising that steam vessels, when towed, should not carry white masthead light, overruling prior rule of Steamboat Inspection Service, though entitled to great weight, is not controlling.

3. Collision ⟨⟩75—Steamer being towed must carry white masthead light, and, unless absence of light could not have contributed to collision, steam tug in charge of towing and vessel itself are at fault (Inland Regulations of 1897, § 1, art. 5 [Comp. St. § 7878], re-enacting Rev. St. § 4233, rule 8 [Comp. St. § 7950]; International Regulations of 1890, arts. 5, 30 [Comp. St. §§ 7841, 7869]).

Under Inland Regulations of 1897, § 1, art. 5 (Comp. St. § 7878), re-enacting Rev. St. § 4233, rule 8 (Comp. St. § 7950), which was repealed thereby, steam vessel, being towed, is required to carry white masthead light, notwithstanding International Regulations of 1890, art. 5 (Comp. St. § 7841), since article 30 thereof (section 7869) provides that rule shall not interfere with special local rules properly made, and steam tug in charge of towing steamer, as well as steamer itself, are at fault for absence of such light, unless absence of masthead light could not have contributed to collision.

4. Collision ⟨⟩125—Conflicting testimony, establishing varying practice as to lights carried by steamers when towed in harbor, will be ruled out, as not establishing custom, and because such custom would violate statute prescribing lights to be carried (Inland Regulations of 1897, § 1, art. 5 [Comp. St. § 7878]).

Conflicting testimony as to custom of steamers as to carrying lights when being towed will be ruled out, as varying practice could not establish custom, and in any event custom would be bad, as violation of Inland Regulations of 1897, § 1, art. 5 (Comp. St. § 7878), prescribing lights to be carried.

5. Collision ⟨⟩77.

Duty to maintain lookout on lower deck of ferryboat is not statutory, but is imposed by general maritime law.

6. Collision ⟨⟩77—Rule requiring presence of quartermaster in pilot house does not excuse absence of lookout (Rev. St. § 4405 [Comp. St. § 8159]).

Rule adopted by Board of Supervising Inspectors under authority of Rev. St. § 4405 (Comp. St. § 8159), requiring presence of quartermaster in pilot house, is maintained to cover any emergency caused by sudden disabil-

ity of pilot, and does not excuse absence of lookout.

**7. Collision ⬗105.**

Testimony *held* to show that steamer being towed was carrying side lights at time of collision with ferryboat.

**8. Collision ⬗138—Claims of members of crew for injuries not discussed either in oral argument or briefs, and doctor treating them not having been examined as witness, will not be passed on.**

Claims of members of crew of steamer colliding with ferryboat, not discussed either in oral argument or in briefs, and doctor who treated them not having been examined as witness, will not be passed on.

**9. Collision ⬗144.**

Where proceedings for collision of ferryboat and steamer in tow of tugs are all in rem, each unit is responsible for its own faults.

In Admiralty. Libel by the Delaware, Lackawanna & Western Railroad Company as owner pro hac vice of the steam ferryboat Scandinavia, against the steamship Joaquin Mumbru, her engines, boilers, etc., whose master, under the fifty-ninth rule, brought in the tugs Dalzelline, J. Fred Lohman, and Fred B. Dalzell, Jr., wherein the Hoboken Ferry Company, owner, and the Delaware, Lackawanna & Western Railroad Company, lessee and charterer, of the ferryboat Scandinavia, and W. Freeland Dalzell and others, as owners of the steam tugs Dalzelline, J. Fred Lohman, and Fred B. Dalzell, Jr., filed petitions to limit their liability. Decree for one-half damages in favor of libelant and the steamship Joaquin Mumbru against the steam tug Dalzelline, and for the balance the usual decree of half damages between the two vessels. Petitions to limit liability granted, and libel dismissed as to tugs Fred B. Dalzell, Jr., and J. Fred Lohman.

Burlingham, Montgomery & Beecher, of New York City (Chauncey I. Clark, of New York City, of counsel), for petitioners.

Walter Jeffreys Carlin, of New York City (William J. Martin, of New York City, of counsel), for The Joaquin Mumbru.

Kirlin, Woolsey & Hickox, of New York City (J. Parker Kirlin, of New York City, of counsel), for libelant.

WARD, Circuit Judge. February 20, 1917, at about 7:15 p. m. on a dark, but clear night, the tide being strong flood, the Spanish steamer Joaquin Mumbru and the ferryboat Scandinavia came into collision, the bow of the steamer penetrating the port side of the ferryboat a little forward of amidships. The steamer, fully laden, without any steam on her boilers, except on the donkey boiler for steering purposes, was being towed down stream by the tug Dalzelline on a hawser, and the tugs Fred B. Dalzell, Jr., on the starboard, and J. Fred Lohman, on the port, quarter were assisting in towing and steering. The steamer carried no mast headlight, and the only other light admitted to have been carried was the stern light in a box at the rail, showing 20 points around the horizon. The ferryboat was on her way up the river from her slip at Barclay street, New York, to her slip at Hoboken.

The Delaware, Lackawanna & Western Railroad Company, the owner pro hac vice of the ferryboat, filed a libel against the steamer, whose master brought in the tugs under the fifty-ninth rule. Thereafter the owners of the ferryboat and of the tugs filed petitions to limit their liability, at the same time denying negligence. The charterer and master of the steamer filed an answer on behalf of the owners and of the owners of the cargo to the petition of the ferryboat, as did also certain members of the crew of the steamer, who claimed damages for personal injuries.

The foregoing statement is sufficient to raise the principal charge of negligence against the steamer and the tugs, which is the failure of the steamer to carry her white masthead light. The situation was governed by the Inland Regulations of 1897 (Comp. St. § 7872 et seq.), which provide that they "are hereby declared to be special rules duly made by local authority," and therefore displace the International Regulations of 1890, which provided, in article 30 (Comp. St. § 7869): "Nothing in these rules shall interfere with the operation of a special rule, duly made by local authority, relative to the navigation of any harbor, river, or inland waters."

[1] The steamer was a vessel "under way," within the preliminary definition (Comp. St. § 7873), because she was "not at anchor, or made fast to the shore, or aground." Article 5 of the International Regulations (Comp. St. § 7841) provides that "a sailing vessel under way and any vessel being towed shall carry the same lights as are prescribed by article 2 for a steam vessel * * * with the exception of the white lights mentioned therein, which they shall never carry." On the other hand, article 5 of the Inland Regulations (Comp. St. § 7878) provides: "A sailing vessel under way or being towed shall carry the same lights as are prescribed by article 2 for a steam vessel under way, with the exception of the white lights mentioned therein, which they shall never carry." The

only other regulations as to lights to be carried by vessels in tow are those for the Great Lakes and their connecting tributary waters as far east as Montreal and Red River of the North and rivers emptying into the Gulf of Mexico and their tributaries, and they prohibit vessels, when towed, from carrying the white masthead light.

Counsel for the steamer and for the tugs contend that the omission in the Inland Regulations of the words "and any vessel towed" is inadvertent. If the Inland Regulations alone were to be considered, there would be no difficulty in holding that steam vessels, when towed, must carry their masthead light. The doubt is created by the different provision made by Congress in the other two acts. The omission, however, is clearly deliberate, because the language of the Inland Regulations is taken from United States Revised Statutes, § 4233, rule 8 (Comp. St. § 7950), which was repealed by the act of 1897, but re-enacted with the single change of substituting the words "a sailing vessel" for the words "sailing vessels," but retaining the plural "they" where the singular number is required. The only inadvertence is grammatical.

[2, 3] There has been submitted to me a letter, dated December 27, 1917, of the Secretary of Commerce to the Secretary of the Navy, advising that steam vessels, when towed in the waters in question, should not carry the white masthead light, and overruling the prior ruling of the Steamboat Inspection Service that they should carry it. This expression of opinion by the Secretary of Commerce, though entitled to great weight, is not controlling, and does not convince me. I think that steam vessels, towed in the waters in question, are required by the Inland Regulations to carry that light.

[4] Testimony was offered as to custom: On behalf of the ferryboat, that steamers, when towed in the harbor, carry either three red lights or the white masthead light; and, on behalf of the steamer, that they carry only the side lights. This testimony was ruled out, because such varying practice could establish no custom, and, if it could, such a custom would be bad as in violation of the statute. This puts the tug Dalzelline, which was in charge of the towing of the steamer, and therefore of the lights which she carried, as well as the steamer herself, at fault, unless it be held that the absence of the masthead light could not have contributed to the condition. The Nettie L. Tice (D. C.) 110 F. 461.

It is contended that, if those on the ferryboat did not see the steamer's sidelights, they would not have seen the masthead light. But who can say this? I think that a brilliant masthead light would not have been likely to escape their observation.

This brings us to the consideration of the ferryboat's navigation, as to which certain significant facts are clear. She was a double decker, 230 feet long and 60 feet in beam, with a pilot house 40 feet above the water. She was going upstream with the tide at a speed of from 12 to 13 knots. The steamer, which was 235 feet long, 34 feet in beam, with a bridge 25 feet above the water, was going down the stream at a speed of from 3½ to 4 knots. I put the combined speed at 16 knots. The length of the towing hawser is estimated by the witnesses of the steamer and the tugs as from 150 to 180 feet, while the master of the ferryboat says it was twice the length of his boat, or 462 feet. The weight of the testimony, as well as the probabilities of the case, satisfy me that the hawser was not over 200 feet in length.

The witnesses for the steamer say that the ferryboat was originally on a course crossing the river toward New Jersey, showing her green light; that she blew the Dalzelline a signal of one whistle, which was answered with one; that the tug ported and the ferryboat passed her very close; that the ferryboat then starboarded, to go under the tug's stern, showing her green light on the starboard side of the steamer, and then ported, showing her red light, the collision following a few seconds thereafter. This would be very extraordinary navigation, and the latter part of it I think impossible, in view of the fact that the ferryboat was 231 feet long, the towing hawser not over 200 feet long, and the time required to pass from the tug's stern to the point of collision, nearly amidships of the ferryboat, a distance of say 200 feet, 12 seconds. I am compelled to reject this account.

[5] The ferryboat's story is that, after she had straightened up the river, she saw the red light of the Dalzelline a little on her port bow, blew a signal of one whistle, ported slightly, and then steadied. As she was passing the tug close by, she discovered a red light, white headlight, and one staff light a little on her port bow, which she took to be a tug some 800 feet away, but which proved to be the Lohman, on the steamer's port quarter. Thereupon the ferryboat blew a signal of one blast, and, getting no answer, blew an alarm, and hard-aported, when the bow of the steamer, showing no lights whatever, appeared on her port side, just forward of amidships, whereupon the ferryboat stopped her engines and at the same moment the collision

occurred. The pilot of the ferryboat admits that he did not expect a hawser tow. This account seems to me more probable. If the ferryboat was meeting the Lohman nearly head on, and first saw her red light, porting would be natural, and would bring about such a collision as followed.

As the steamer was 34 feet in beam, and I suppose the Lohman was about 20, the distance between their keels would be less than 30 feet, which is half the ferryboat's beam. Accordingly, if the ferryboat and Lohman were meeting nearly head on, a very little change to starboard would bring the port side of the ferryboat across the steamer's bow, and so the collision could be accounted for. Meeting thus, the ferryboat should have seen the red light of the steamer, if it was burning, and certainly the red light of the Lohman, when she signaled the Dalzelline, and had quite time enough to go clear. The pilot did not awaken to any danger whatever until the few seconds before the collision, whereas, when he blew his first signal to the Dalzelline, he was, according to his own testimony, 1500 feet below the steamer, which, added to her length, 92 feet, and the length of the towing hawser, 200 feet, put him 1,792 feet from the steamer's bow, a distance which he could have covered in a little over one minute, and in which, if he had seen only the Lohman's red light, he could easily have passed clear. This involves a bad lookout, which sometimes happens, even in broad daylight. There is no evidence that there was any lookout on the lower deck of the ferryboat at all. The duty to maintain such a lookout is not statutory, but one imposed by the general maritime law.

[6] The presence of the quartermaster in the pilot house was in compliance with the rule adopted by the Board of Supervising Inspectors, under the authority given them by section 4405, United States Revised Statutes (Comp. St. § 8159), as follows:

"9. All passenger and ferry steamers shall, in addition to the regular pilot on watch, have one of the crew also on watch in or near the pilot house: and this rule applies to all steamers navigating in the nighttime."

This rule is intended to cover any emergency caused by the sudden disability of the pilot, and did not excuse the absence of a lookout. The fact that the pilot immediately called upon the master of the New York Central tug No. 25 to notice that the Dalzelline carried but two towing lights, and said not a word about the absence of any side lights upon the steamer, is very strong evidence that he had no complaint to make in this respect.

[7] It is true that the quartermaster, who was in the pilot house, testified that he spoke to two passengers on the upper deck about the absence of the side lights; but their depositions were previously taken, and they were not asked anything about this conversation. As the vessels remained together over an hour, with many tugs working around to separate them, it seems to me quite incredible that a pilot, who was so particular to point out what he thought a defense in respect to the towing lights, would not have obtained absolute proof that the steamer's side lights were not burning. The testimony convinces me that they were burning.

I come to this conclusion without considering the testimony of Mushman, deck hand of the ferryboat, the correctness of which in the stenographer's notes is in doubt. There is, in the first place, the great improbability that the Dalzelline would have towed the steamer without side lights, in addition to which there is positive testimony that they were burning, which outweighs the testimony of most of the disinterested witnesses to the contrary, who were not looking for lights. There is also a dispute as to whether the Lohman carried two staff lights. There was but one burning after the collision, but the testimony is convincing that before the collision she was carrying two, and the shock may well have put one out.

[8] There has been no discussion, either in the oral argument or in the briefs, as to the claims of members of the steamer's crew for permanent injuries, and the doctor who treated them has not been examined as a witness. Therefore I do not pass upon them.

[9] It is to be noted that the proceedings are all in rem, and although the tugs and tow were, for some purposes, to be considered one vessel, each unit is responsible for its own faults. The Eugene F. Moran, 29 S. Ct. 339, 212 U. S. 475, 53 L. Ed. 600. The Fred B. Dalzell, Jr., and J. Fred Lohman were assisting in the towing and in steering the steamer after the Dalzelline, under orders given on a mouth whistle by the master of the Fred B. Dalzell, Jr., from the steamer's bridge. The steamer was so steered until the master of the Dalzelline ordered the towing hawser to be cut, because the collision was imminent and nothing these tugs did or could do in the few seconds preceding the collision put them at fault.

There will be a decree for one-half damages in favor of the steamer and the ferryboat against the tug Dalzelline primarily, and for the balance, the usual decree of half damages between the two vessels: the peti-

tions to limit liability will be granted; the libel will be dismissed as to the tugs Fred B. Dalzell, Jr., and J. Fred Lohman, with costs against the owners of the steamer who brought them in.