## THE LE COQ.

(District Court, E. D. Louisiana. December 7, 1925.)

No. 17313.

1. **Collision** ⊜69—**Navigation and anchoring in navigable water of river, without reference to range lights or markers, not unlawful, nor negligence per se.**

Neither navigation of ship in navigable water of river, without reference to range lights, or markers, nor anchoring of craft of any kind in or near such fairway, is unlawful, or evidence of negligence per se.

2. **Collision** ⊜89—**That range markers indicate two channels in navigable part of river does not change character as fairway with respect to right of navigation.**

That two channels are indicated by range markers in expansive part of Mississippi river where South and Southwest Passes converge does not change character of body of water as fairway in all its parts with respect to right of navigation therein.

3. **Collision** ⊜71(1)—**Collision between moored barge and moving steamship held due to negligence of both barge owner and steamship pilot.**

Collision between moored barge and moving steamship at night *held* due to negligence of barge owner in failing to place suitable lights on barge, and gross negligence of steamship pilot in shaping course by oil lantern and failing to know exact position of ship.

In Admiralty. Libel by the United States against the steamship Le Coq. Decree for division of damages.

Edouard F. Henriques, Sp. Asst. U. S. Atty., of New Orleans, La.

Denegre, Leovy & Chaffe, of New Orleans, La., for defendant.

BURNS, District Judge. Libelant, United States of America, as owner of a barge designated as No. 29, loaded with stone, claims damages for its loss by sinking as a result of collision with it by the British steamship Le Coq, at or about 4 o'clock a. m. on October 28, 1922, whilst the same was made fast to a mooring barge anchored at the head of the passes of the Mississippi river. It appears from the evidence that the United States engineers of the War Department engaged in river improvement had previously notified the Associated Branch Pilots in writing that navigation through South Pass would be closed between 7 a. m. and 3 p. m. on October 27, 1922, according to their custom when their operations made such closure necessary.

Various government derrick barges and other equipment had been assembled in the vicinity for some time previous. On that day, at about 1 o'clock, the work was completed, and the man in charge of the engineering work went to the pilot station just above the head of the Passes, which is the point of divergence of the river through its various passes to the sea, and notified the bar or branch pilots that navigation could be resumed. This notification was given orally to Pilot Armstrong, advising him that the position of the mooring barge and barge 29 had been changed from a point near to and about 150 feet off the east bank of the river to a point about 210 feet west of the entrance range line of South Pass in the roadway, and about 1,200 feet due north from the West Light, on the point or headland dividing the entrance of South Pass from Southwest Pass. This information was relayed to all the pilots by telephone to the lower station at the mouth of South Pass, at which time, however, two pilots, including the one who later piloted the Le Coq from sea, were outside on duty and did not receive the information.

The place at which the barges were anchored is at a point where the river from the east to the west shore line is about 3,600 feet wide, the river running approximately due north and south. Some 1,800 feet further north, or upstream, a traversing line across the river from bank to bank, abreast of the East Point Light, the point of divergence of the river into Pass a L'Outre, the river width increases to some 7,200 feet. Next above the entrance to Pass a L'Outre is Cupid's Gap, another diverging pass of the river to the Gulf, up to about which point this expansive width of river continues, tapering thence northward gradually to the river's normal width. The whole of this wide expanse has a varying depth of from 25 to 45 or more feet, and is entirely navigable, according to the soundings shown on the maps of record, and this situation is to be considered, necessarily, by reason of the contentions made on both sides in this case.

Barge No. 29, measuring 100 feet length, by 22 feet width, by 6 feet depth, loaded with stone, was lashed alongside the mooring barge, known as No. 36, on its downstream side, and this mooring barge was 120 feet long by 40 feet wide, with a freeboard of 6 feet. The mooring barge was anchored both fore and aft crosswise the stream at an angle of about 45 degrees to the shore line. To the forward anchor was paid out on a line 300 feet long, or on the greater part of it, in an approximate dept of 30 feet of water, so that she rode something more than

200 feet from the anchor, which was marked by a barrel buoy, to which was rigged an ordinary oil lantern at an elevation of 4 feet. The buoy was riding on a 75-foot line, so that this buoy must have been held by the current toward the barge at a distance of some 50 feet from the anchor, and therefore the distance between the lighted buoy and nearest or forward port corner of the unlighted barges must have been approximately 150 feet. The engineer's blueprint, on a scale of 300 feet to one inch, shows a distance between the buoy and barge of about 100 feet, which exceeds that testified to by the engineer's man, who surveyed the location and located same on the blueprint, according to his recollection of observations made the evening before and the morning after the accident.

This, considered in connection with other testimony in the record, clearly indicates that this ordinary oil lantern, riding in the darkness at the elevation of 4 feet from the water, was probably nearer 100 feet than 50 feet from the nearest end of the barges, which were of the size above stated and entirely unlighted otherwise. It should be observed, too, that this lighted buoy bore northeasterly of the barge corner, so that the light of the lantern, though visible on a dark, clear night for probably less than a mile, could not illumine the circumjacent waters more than a few feet beyond it, or expose to view other objects, such as the low-lying, but higher, hulks of the barges; nor would the light itself be visible at all for an arc of considerable magnitude from southerly and westerly directions, because of the obstructing hulks of the barges, and within this arc was the opening of Southwest Pass.

Notice should here be taken of the navigation rules prescribing the method of lighting of such craft at night. The published rules of the Department of Commerce, Steamboat Inspection Service, designated as "Pilot Rules for the Rivers Whose Waters Flow into the Gulf of Mexico and Their Tributaries and the Red River of the North," which, together with its caption, read as follows:

"Lights for Rafts and Other Water Craft Navigating the Red River of the North and Rivers Emptying into the Gulf of Mexico and Their Tributaries, Propelled by Hand Power, Horse Power, or by the Current of the River.

"All coal boats, trading boats, produce boats, canal boats, oyster boats, fishing boats, and other water craft, except as hereinafter otherwise provided, navigating any bay, harbor, or river, propelled by hand power, horse power, or by the current of the river, or which shall be anchored or moored in or near the channel or fairway of any bay, harbor, or river, shall carry one white light forward, not less than 8 feet above the surface of the water.

"Rafts propelled by hand power or by the current of the river, or which shall be anchored or moored in or near a channel or fairway, shall carry white lights, as follows:

"Rafts of one crib and not more than two in length shall carry one white light. Rafts of three or more cribs in length and one crib in width shall carry one white light at each end of the raft.

"Rafts of more than one crib abreast shall carry one white light on each outside corner of the raft, making four lights in all.

"The white light required by these rules for rafts and other water craft shall be carried, from sunset to sunrise, in a lantern so fixed and constructed as to show a clear, uniform, and unbroken light, visible on a dark night with a clear atmosphere at a distance of at least one mile. The lights for rafts shall be suspended from poles of such height that the light shall not be less than 8 feet above the surface of the water.

"Rowing boats under oars shall have ready at hand a lantern showing a white light which shall be temporarily exhibited in sufficient time to prevent collision."

Going up and out of South Pass into this expanded fairway, at full speed, against the current, at 4 o'clock in the morning, after the moon had set, and as claimant's counsel puts it, in the proverbial darkest hour which precedes the dawn, was the Le Coq, whose pilot last knew of this barrel buoy, with barges attached, as being located near the East Bank, and, not having been notified of the change of its location, he assumed it was still there.

On seeing it 1,200 feet ahead, he shaped a course by it and to pass to the west of it. As he did so, however, his position did not check properly with the South Pass range lights, and immediately he began to port his helm. He states in the testimony that he saw by the range that there was something wrong, "Lord! that is not right! and I started to port, and kept porting all the time." His next answer was, "To go on the east of the buoy, as I noticed it wasn't in its proper place." Just then the man on the lookout sang out, "Lighter ahead," and the

engine was immediately stopped. There was no time to reverse, because immediately after the lookout man sang out the ship was into the barge. He had promptly ported the helm hard, but the ship's port bow rubbed barge No. 29 on its starboard forward corner. The barge listed, spilling stones, and sinking as the ship passed under decreasing headway within 20 feet east of the lighted buoy.

[1] The contentions of the proctor for libelant to the effect that the range lights on the river bank are designed to peremptorily fix the course of vessels and direct their movements, acting as semaphores do on a railroad, and that vessels must steer in exact accord with them, cannot be sustained. These range lights, shown at night, correspond with the channel range markers, similarly located, used by day as an aid to navigation, and merely indicate the deepest channel courses in the river. The navigation of a ship in any part of the navigable water in the river, without reference to the range lights or markers, is not unlawful, nor evidence of negligence per se. On the other hand, the anchoring of craft of any kind in or near such fairway is not unlawful, nor evidence of negligence per se.

[2] Although two channels are indicated by range markers, one to and from South Pass and one to and from Southwest Pass, converging in this expansive part of the river, it does not have the effect of changing the character of that navigable body of water as a fairway in all of its parts with respect to the right of navigation therein, although the designated main channels may define in fact the general courses used by ships, so that some parts thereof might be safer and more convenient anchorage grounds than others.

[3] Upon all of the evidence, I have come to the conclusion that the collision resulted from the negligence of both parties. The negligence of the libelant in failing to place suitable lights on each of the two barges at suitable heights, these barges lying, as they were, unmanned and unprotected from such property damage to it or to the property of others as might result from collision in the darkness, was of itself, at least, sufficient negligence to prevent their recovery of full damages because of this collision. The rule requiring lights might as well have been disregarded altogether as to be only partially complied with, and then in a manner which failed to be of any real service.

Likewise the negligence in navigation of the ship was equally conspicuous. The pilot aboard that vessel confessed his fault by admitting that he shaped his course by such a thing as an oil lantern, the use and purposes of which was under the control of workmen, who might shift the location of the light at any time, as he knew. Numerous stationary, and therefore dependable, shore lights of various kinds are maintained contiguous to the water he was navigating. His services are compulsorily imposed on the shipowners, upon the theory that the required service should be rendered by men having the highest degree of skill and entirely familiar in every detail with local waters and conditions. Under such circumstances, and under the weather and other favorable conditions prevailing on the night in question, the mere failure on his part to know the exact position of his ship, even if for a brief period of time, must be construed as gross negligence. The case, therefore, seems one in which the damages should be divided.

There will be a decree accordingly. Each party to pay its own costs.