NORTHERN PETROLEUM TANK
STEAMSHIP CO., Ltd., as Owner of the
Motor Vessel Tynefield, Libelant,

v.

CITY OF NEW YORK, as Owner of THE
ferryboat DONGAN HILLS,
Respondent.

CITY OF NEW YORK, as Owner of the
ferryboat Dongan Hills, Libelant,

v.

THE M/V TYNEFIELD, her engines, etc.,
and
Northern Petroleum Tank Steamship Co.,
Ltd., Hastings & Sons, and Furness
Withy & Co., Ltd., Respondents.

Petition of City of New York, as Owner
of the ferryboat Dongan Hills for a lim-
itation of or exoneration from liability.

United States District Court
S. D. New York.
Feb. 29, 1960.

Symmers, Fish & Warner, New York City, William Warner, William G. Symmers, Peter J. Malloy, Jr., New York City, of counsel, for Northern Petroleum Tank Steamship Co., Ltd.

Charles H. Tenney, Corp. Counsel, City of New York, New York City, Paul P. Burke, James W. Fay, New York City, of counsel, for City of New York.

MURPHY, District Judge.

At about eight o'clock in the cold, clear, moonless evening of February 8, 1958, the vast expanse of New York Harbor was practically devoid of moving traffic. Only two vessels were in motion—the M/V Tynefield and the New York City ferryboat Dongan Hills. The Tynefield, emerging from the Kill Van Kull into the Hudson River channel, was heading east at about two-and-one-half to five knots. The Dongan Hills was heading southwest at about 13 knots for its slip at St. George, Staten Island.

Despite the many conflicts in the testimony of the respective crews all admit that these two vessels collided at right angles 650 feet south of Buoy 27. Hence these proceedings in admiralty.

The Tynefield's version of the collision may be summarized as follows:

It claims it sighted the Dongan Hills about four minutes before the collision, when it was about one mile distant. Since a crossing situation was developing and the Tynefield was the privileged vessel she gave a one-whistle blast signifying her intention of holding course and speed, i. e., 098° and slow ahead. At this moment the Dongan Hills was about one-half mile distant. The Tynefield waited 15 seconds without a response from the Dongan Hills and then gave another single blast, followed by five or six short ones as an alarm. Sensing that the Dongan Hills neither heard nor saw her she put her engines stop, full astern, and her helm hard astarboard. But *miserable dictu*, the Dongan Hills kept acoming and at the time of impact the Tynefield was either dead in the water or had headway of one knot.

The Dongan Hill's version, as one would expect, is a little different. It left its slip at the Battery about 7:40 p. m. with its captain at the helm. When it rounded Governor's Island the captain turned the helm over to his assistant and repaired to a settee where, while seated, he acted as lookout. When the Dongan Hills was abeam of Buoy 27 the assistant captain and the captain, who was now standing alongside, saw the Tynefield 600 to 700 feet away. Four short blasts were immediately given as an alarm and then three short ones, indicating full speed astern. These men heard no signals from the Tynefield and only one saw the Tynefield's lights. At the time of contact not only had the Dongan Hills come dead in the water but it was actually making sternway.

To complete the picture it is undisputed that the tide was just beginning to flood and that there was a strong northwest wind about 25 to 30 miles and further, we conclude that both vessels had their navigation and running lights on at the time.

On all the evidence we find that the collision was occasioned by the equal fault of both vessels. This conclusion is based on the following facts:

As to the Dongan Hills. It was at fault because it failed to maintain a proper lookout and because it failed to hear the signals from the Tynefield, and consequently it ran blindly into a position from which it was impossible to extricate itself. The Mauch Chunk, 2 Cir., 1907, 154 F. 182, 185.

Evans, the assistant captain, was obviously not keeping a sharp lookout, and since he had the wheel at the time cannot be considered as performing the duties of a lookout. The captain, comfortable upon the settee, was not a lookout either. In fact the Dongan Hills had no lookout whatsoever.

We reject the Dongan Hill's testimony that at the moment of impact it had lost its headway and was making sternway. It took 15 seconds to change her engines from full ahead to stop, to full astern, but changing the engines to sternwise is not the same as making sternway. Her captain said it would take two minutes to do this from her speed of 13 knots. It was impossible for her to have been making sternway if we accept her testimony that the engine signals were given when the Tynefield was 600 to 700 feet away. The fact is that the Dongan Hills assumed she had some prescriptive rights to the fairway and just kept plowing ahead on schedule.

As to the Tynefield, she had left her pier at Bayonne with the docking pilot, Syversten, at the conn and proceeded without event through the Kill Van Kull at about five knots. The docking pilot was relieved by river pilot Warner, who was on the bridge from the time the Tynefield had left Bayonne. This change of command took place about four minutes before the collision. Although the docking pilot testified that before the change in command took place he had reduced his speed to slow ahead and was making about two-and-one-half knots, we find as a fact that the speed was not so reduced and have some misgivings as to whether the docking pilot gave the order of slow ahead at all. (See dis-

cussion later concerning the bell books). When Warner took command the Tynefield was steady on her course of 098° and the Dongan Hills was about three-quarters of a mile off his port bow, although he had seen it a mile away a short while before he took command.

On the bridge of the Tynefield there was a small crowd. What in fact all were doing is not too clear. We are, however, certain that the speeding Dongan Hills off her port bow gave them little or no concern until it was too late. Her master was present, as was her third officer, and so was the docking pilot, the river pilot and a Chinese helmsman and, according to one of them, the visibility was so good one could see for 20 miles.

One fact seems undisputed and that is, that the two pilots, the master and the third officer were each aware of the oncoming ferry when it was at least a mile away. Added to such indifference to sound navigation is the fact that the Tynefield had no lookout either. Although there is considerable contrary testimony by some of the Tynefield's crew as to the nearness of the Dongan Hills at the time of the giving of the first signal, we are willing to attribute this confusion to the difficulty in examining the Chinese helmsmen (there were two of them in this case) through an interpreter. Perhaps the cold record of the deposition is an unfair way to appraise their testimony under the circumstances. We are willing, and do discount their testimony and assume that they were in error, but it still leaves all the responsible officers conscious of the oncoming ferry one mile away. Perhaps the absence of a lookout cannot be considered a fault and did not contribute to the accident. What more he could have contributed with all in charge conscious of the ferry's approach is hard to imagine.

It is obvious to us that the Tynefield took no precaution to avoid the impending collision until it was too late, relying recklessly on its "privilege" in this crossing situation. Regardless of the right and privilege of the Tynefield to maintain her course and speed there was a continuing duty on her part to exercise care to avoid collision until the crossing was safely effected. We find that she failed to discharge that duty; that she failed to change her speed and course until too late, and that such failure requires her to share the damages occasioned by the collision.

A word or two (to quote a phrase) concerning the bridge and engine bell books. First, we will never understand why a court is asked to put any reliance on this type of record. Perhaps we are too inexperienced, but it has not been our lot to see any bell books in which erasures and re-entries are not present. In the instant case the erasures and re-entries are patent, particularly relating to the three or four minutes involved prior to the accident. We should think that we could draw an inference adverse to the Tynefield just because of the erasures. At least we would feel morally certain that they were made to cover some default. In any event, we choose to disregard them as being unworthy of belief and confine our opinion to the testimony. It is interesting, however, to collate these entries with the testimony of the two Chinese helmsmen. They are interesting, too, in another respect, and that relates to the speed that the Tynefield was making at the time. We will assume that it was making two-and-one-half knots at the time the docking pilot relinquished command to the river pilot (which in itself is quite an assumption). The bell book entries should be compared with the testimony of the Tynefield's engineers that only seconds elapsed between the order to stop engines and the order to put them full astern and the collision. If at that time she was proceeding on slow ahead at two-and-one-half knots and had, two or three minutes before, been proceeding at one-half ahead or five knots, it is obvious that the Tynefield could not have lost much headway between those orders and the collision.

A subsidiary question remains, viz., the question of limitation of liability.

The City of New York filed such a petition and offered evidence to support it. We conclude, however, that it failed to meet its burden and its petition should be denied.

It is quite evident that customarily no lookouts, as such, were ever posted on the city's Staten Island ferries. The proof showed that the crew of the Dongan Hills and other city ferries consisted of eleven men—four deckhands under the supervision of a mate, whose combined duties consisted of patroling the ferry to insure against disturbances, disorder, fire and the like, to handle the lines when entering and leaving the slips, and to direct the loading and unloading of passengers and vehicles; four crewmen in the engine room; and finally, the captain and assistant captain, both of whom actually piloted the vessel in turns.

Captain McGuire, Director of Ferry Operations for the city since 1950 and a man with considerable maritime experience before that, testified that he did not require a lookout, no rule or regulation of the City of New York required a lookout, and he did not know whether or not a lookout was posted on the Dongan Hills on the night in question.

The captain of the Dongan Hills testified that a lockout usually was kept from the wheelhouse of the ferry by either himself or the assistant captain. He further stated that this was the best vantage point on the vessel from which he could see all around the harbor, and to within 15 or 20 yards in front of the bow. Captain McGuire stated that a pilot house lookout was in accordance with Coast Guard regulations.

Whatever the Coast Guard regulations relative to a pilot house lookout may be, it is a well settled rule of navigation "that *all* moving vessels *shall* maintain a careful and efficient lookout." [Emphasis supplied.] Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 1928, 26 F.2d 603, 605; The Paris, D.C.S.D.N.Y.1930, 37 F.2d 734, 739; 33 U.S.C.A. § 221. This rule applies at least with equal force to ferries as well as all other types of craft. East-ern Dredging Co. v. Winnisimmet Co., 1 Cir., 1908, 162 F. 860; The Mauch Chunk, supra; The Scandinavia, D.C.S.D.N.Y.1918, 11 F.2d 542; The Ralphie B, D.C.E.D.N.Y.1945, 64 F.Supp. 299. The responsible officer of the city, the Director of Ferry Operations, had knowledge and apparently condoned the practice of not maintaining a lookout, as such, aboard the city's ferries. That knowledge precludes the granting of the petition for limited liability for the damages proximately caused by the failure to post a lookout aboard the Dongan Hills.

Since the petition of the city should be denied no finding is necessary relating to the proof submitted as to the value of the Dongan Hills.

Accordingly, a decree will be entered adjudging the Tynefield and the Dongan Hills equally at fault, and the petition of the City of New York for limitation of liability is denied.

Decree accordingly.