Felicien **DUET**, Libelant,

v.

**DELTA MARINE DRILLING COMPANY** and the **DRILLING TENDER JOSEPH ZEPPA**, Her Engines, Tackle, Apparel, Etc., Respondent.

No. 4947.

United States District Court
E. D. Louisiana,
New Orleans Division.

March 28, 1963.

George Ehmig, Thomas B. Wheeler, New Orleans, La., for libelant.

Phelps, Dunbar, Marks, Claverie & Sims, J. Barbee Winston, New Orleans, La., for respondent.

Terriberry, Rault, Carroll, Yancey & Farrell, Rufus C. Harris, Jr., New Orleans, La., for intervening libelant.

AINSWORTH, District Judge.

The M/V LADY PHYLLIS, a 64-foot wooden diesel supply vessel sank at about midnight of September 2, 1961, when she struck a mooring buoy of the drilling tender JOSEPH ZEPPA, approximately 7½ miles south of Grand Isle, Louisiana, in the Gulf of Mexico. The owner of the M/V LADY PHYLLIS, Felicien Duet, filed a libel in personam and in rem against the JOSEPH ZEPPA and her owner, Delta Marine Drilling Company. Federal Insurance Company intervened as a libelant, seeking recovery of $15,-000 by virtue of subrogation, having paid Duet the full amount of its hull policy on the LADY PHYLLIS.

The night was dark but clear. The wind was out of the south at about 15 to 20 miles per hour; the seas were about 4 to 6 feet in height. The LADY PHYLLIS, with her captain and a deckhand aboard, was traveling full speed ahead, 10 to 12 miles per hour, when the collision occurred.

The JOSEPH ZEPPA, which is approximately 328 feet long and 50 feet wide, having no motor power of her own, was moored at an oil well drilling location in Block 16 in the Gulf of Mexico. She was moored so that her bow was adjacent to a stationary drilling platform and she was headed in an approximate southeasterly direction. She was held in position at the drilling platform by six mooring rafts, three on each side of the vessel—one forward of the bow, another approximately abeam the bow and the other abeam the stern—and two anchor chains off the stern. The mooring rafts were steel barges measuring 17½ feet in length by 12 feet in beam, with a depth of 2 feet, weighing approximately 20,000 pounds, and connected by means of a chain bridle and a length of chain to pilings driven into the ocean floor. The rafts were light yellow in color. They were not lighted, there was no reflective material thereon and they carried no masts or superstructures. The drilling rig and the JOSEPH ZEPPA were well lighted, however. Double steel cables ran from the JOSEPH ZEPPA to the rafts at right angles to the boat. The rafts were approximately 400 feet distant from the JOSEPH ZEPPA.

We are concerned with the two mooring rafts off the bow and the stern of the port side of the JOSEPH ZEPPA, which were approximately 300 feet apart. It was the intention of the captain of the LADY PHYLLIS to travel parallel to the JOSEPH ZEPPA until sighting the two rafts and then turn right toward the port side of the JOSEPH ZEPPA approximately amidships between the two rafts in order to service the JOSEPH ZEPPA. This maneuver was not accomplished. The LADY PHYLLIS collided with the raft off the stern on the port side of the JOSEPH ZEPPA. The LADY PHYLLIS sank to the bottom in approximately 52 feet of water some time later.

■ This is clearly a case of joint negligence of the employees of libelant and respondent combining to cause the sinking of the LADY PHYLLIS.

■ The captain of the LADY PHYLLIS was negligent in failing to take proper precautions under the prevailing circumstances. He admittedly knew of the mooring system of the JOSEPH ZEPPA. He had serviced her many times prior to the collision. It was moored as he expected it to be. He knew that the mooring rafts were unlighted. He was aware of the weather conditions; that a high sea was running; that there was talk of a possible hurricane; and that the rafts would be difficult to see in rough seas. He and the deckhand were scanning the seas searching for the rafts with the aid of a spotlight when the collision occurred. The evidence shows that he was confused about the relative position of the LADY PHYLLIS, the rafts and the JOSEPH ZEPPA. He testified that he estimated the rafts to be 800 feet from the JOSEPH ZEPPA but admitted that the distance could have been 400 feet. Despite his knowledge of existing conditions he was traveling full speed ahead, 10 to 12 miles per hour, when the collision occurred. Although this rate

of speed may have been safe and even desirable for maneuverability on a calm open sea, it was dangerously unsafe in the area where the presence of the mooring rafts was expected. The question of what is a proper rate of speed is relative to the situation of the ship.[1] Prudence and caution here would have dictated a reduced speed.[2]

All moving vessels must maintain a careful and efficient lookout. The two members of the crew, the captain and the deckhand, were in the pilothouse when the vessel struck the raft; there was a spray blowing on the windshield of the vessel. Because of the tendency of the bow of the LADY PHYLLIS to rise at full speed, someone standing in the pilothouse would be unable to see the surface of the water directly ahead. The bow of the vessel would obviously have been a better vantage point for spotting the mooring rafts than the pilothouse. The captain felt that it would have been unsafe to place his brother the deckhand, on the bow, although there was a railing around the deck. It is certainly not suggested that he should have subjected anyone to danger. However, substituting a lesser danger by allowing his deckhand to remain in the pilothouse while surging ahead at full speed, and thus failing to comply with a fundamental rule of navigational safety, the duty to provide a proper lookout, was not a proper solution to his dilemma. An efficient lookout

could have been maintained from the pilothouse had he reduced his speed.

Respondent is likewise negligent in failing to take the proper precautions to render the mooring rafts visible. The testimony was conflicting as to whether these rafts could be seen at all times. The photographic evidence, however, shows that they have a very low freeboard. They are of flat, horizontal construction. It is apparent that in a rough sea it would be difficult for any moving vessel, and almost impossible for small craft, to sight them, particularly under the additional handicap of the glare from the drilling rig and tender. This navigational hazard could have been eliminated by lighting the rafts, or by placing reflective material thereon, or by the use of a raft with a higher freeboard, or by a mast or superstructure on the raft which would reflect the light from the rig and tender. Title 33, Section 221 of the United States Code,[3] the general prudential rule of the Inland Rules, alone would require at least one of these precautions.

"Aids to Navigation Regulations" of the United States Coast Guard are specifically applicable as to lighting requirements for the type of mooring raft involved. Section 67.05-1[4] thereof provides for obstruction lights to be placed on structures and for the arrangement of such lights. Section 67.01-5[5] defines structures and lists a number of examples

1. The George H. Jones, 2 Cir., 1928, 27 F. 2d 665.

2. Northern Petroleum Tank Steam. Co. v. City of New York, S.D.N.Y., 1960, 181 F.Supp. 192; 33 U.S.C.A. § 221.

3. "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. June 7, 1897, c. 4 § 1, 30 Stat. 102." A drilling barge, anchored and moored in a manner similar to the JOSEPH ZEPPA has been considered as a vessel. The Marian, 9 Cir., 1933, 66 F. 2d 354.

4. "§ 67.05-1. Arrangement of obstruction lights. (a) Structures having a maximum horizontal dimension of 30 feet or less on any one side, or in diameter, shall be required to have one obstruction light visible for 360°."

5. "§ 67.01-5. Definitions—(a) Structures: The term 'structures' as used in this part shall include all fixed structures, temporary or permanent, for which a Corps of Engineers' permit is issued. It shall include, *but is not necessarily limited to*, all drilling platforms, production platforms, quarters platforms, pipe line riser platforms, manifold platforms, loading platforms, boat landings, caissons, well protective structures, tank battery barges submerged on station, drilling barges submerged on location, break-

of structures. It does not specifically list a mooring barge or raft or buoy, but this listing is not exclusive, as the language itself so shows. Section 66.01–35 provides that "Any structure, including floating plants, moorings, *mooring buoys* * * * shall display the lights * * * as may be prescribed by the Commandant * * * " (Emphasis supplied.)

Section 66.01–35 resolves any doubt as to a mooring barge not being a "structure" under the regulations. Consequently, the requirements for its lighting are governed by Section 67.05–1, despite the fact that the Commandant has not specifically prescribed the type of lighting to be used by the exact type of mooring raft with which we are concerned.

A reading of Rule 80.29 of the Pilot Rules (authorized by 33 U.S.C.A. § 157) fortifies our holding that respondent was negligent in failing to render the mooring rafts visible. The applicable part of this rule reads:

> "Breast, stern, and bow anchors of floating plant working in navigable channels shall be marked by barrel or other suitable buoys. By night approaching vessels shall be shown the location of adjacent buoys by throwing a suitable beam of light from the plant on the buoys until the approaching vessel has passed, or the buoys may be lighted by red lights, visible in all directions, of the same character as specified in § 80.24(a) * * *."

Respondent argues that the above-quoted Pilot Rule is not applicable here because it contains the phrase therein, "in navigable channels," and it contends no such channel is involved here. A channel has been defined as the customary and traveled fairway for craft of the particular class under consideration. The Le Coq, E.D.La., 1925, 10 F.2d 246; The Arlington, 2 Cir., 1927, 19 F.2d 285. Under the circumstances of the case the area in which the collision occurred was a navigable channel, customarily traveled by small craft for the servicing of the JOSEPH ZEPPA.

Because of the negligence of libelant's employees which directly contributed to the collision, damages will be divided and libelant and respondent will each bear one half of said damages. Libelant is entitled to an interlocutory decree subject to intervenor's rights of subrogation, all in accordance with this opinion.

water barges submerged on location, artificial islands and all other piles, pile clus-

ters, pipes, or structures erected in the waters." (Emphasis supplied.)