## THE GEORGE H. JONES.

## THE SUNOCO.

Circuit Court of Appeals, Second Circuit.
July 23, 1928.

No. 318.

1. **Collision** ⊂⇒66—**Ship leaving course and colliding with tow on steady and obvious course is prima facie at fault.**

A ship leaving her course and colliding with tow, which was on steady and obvious course, is prima facie at fault.

2. **Collision** ⊂⇒95(4)—**Ship moving seven miles per hour in crowded harbor held at fault in collision with tow.**

Ship moving at rate of speed of at least seven miles per hour in a crowded harbor, wherein there were several small tugs, besides other ships and ferry slip, from which at any time the ferry might emerge, *held* at fault in collision with tow proceeding on a steady and obvious course.

3. **Collision** ⊂⇒95(5)—**Ship attempting port passing on approaching parallel held at fault in resulting collision with tow of approaching ship.**

Ship signaling for a port to port passing on approaching nearly parallel, so as to require a starboard passing, thereby causing approaching ship to hard astarboard and give different signal, *held* at fault in resulting collision with tow of approaching ship.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the James McWilliams Blue Line, Inc., and another against the steamship George H. Jones, etc., claimed by the Standard Oil Company, wherein the steamship Sunoco, etc., claimed by the Société Anonyme D'Armement D'Industrie et de Commerce, was impleaded. Decree for libelant, holding respondent solely at fault, and claimant Standard Oil Company appeals. Decree modified.

McWilliams sued the tanker, Jones, for colliding with and sinking one, and injuring another, of his barges, then in tow of his tug, Kellers, off the northern shore of Staten

Island in New York Harbor. The Jones brought in the Belgian tanker, Sunoco, under the fifty-sixth rule, and the District Court held the Jones solely at fault.

On the morning of October 24, 1923, the Kellers, with four loaded coal barges in tow in two tiers, was making out of the Kill von Kull, bound south. The barges were on a hawser of about 150 feet, and the tow was 300 or 400 feet off shore. The Belgian tanker, Sunoco, had left her pier at Bayonne with a full cargo of gasoline, naphtha, and the like, also bound to sea through the Kill, in charge of a harbor pilot. She was about 300 feet outside the tow and moving faster, and as an overtaking vessel she blew two blasts, and passed the tow to port, some distance before the point of collision. She ported into the dredged channel usually followed by larger craft, and at about its southern end encountered a little on her port hand a Staten Island ferryboat, the Mayor Gaynor, waiting to enter her slip. At that time only one slip was in use and this was occupied by the ferry, Brooklyn, whose exit the Mayor Gaynor was expecting. A third ferry, the Queens, was also waiting outside, but so far off to the port hand of the Sunoco as not to be a factor in the navigation of any of the vessels concerned. The Sunoco stopped her engines and moved slowly forward with her momentum, waiting for the Mayor Gaynor to enter the slip. At the same time she gave the ferry a double blast to indicate that she yielded her privilege. The Brooklyn at about the same time came out and crossed her bows, leaving the slip vacant for the Mayor Gaynor, which thereupon entered, crossing the Sunoco's bows.

Meanwhile the tanker, Jones, was coming up from Quarantine 400 or 500 feet off the Staten Island shore, bound for her berth at the Standard Oil dock at Constable Hook. She was on the range which would bring her into the dredged channel; she and the Sunoco was therefore nearly, if not quite, on parallel courses. When the Brooklyn came out of her slip, she gave the Jones a signal of two blasts, and shortly afterwards the Jones gave a similar signal, though whether to the Sunoco or the ferry, or to both, is in dispute. At any rate the Brooklyn crossed her bows, as did the Mayor Gaynor, leaving the two vessels with nothing between them, the Jones with undiminished speed, the Sunoco still moving slowly.

The Sunoco thereupon blew to the Jones a single blast and ported her helm. The Jones, believing a port to port passing impossible, hard astarboarded and blew a double blast. The Sunoco thereupon starboarded in turn and the vessels cleared, starboard to starboard, by a margin of between 50 and 75 feet. The Jones' engines were put full speed ahead when she hard astarboarded, and she came rapidly into the water of the tow, which had all this time been moving southward off the pier ends. Either because she smelt bottom, or because she was in too close quarters, the Jones failed to answer her port helm, and collided with both the port barges of the tow, doing the damages complained of. When about abreast of the Sunoco and about 1,000 feet from the point of collision, the Jones stopped, backed, and let go both anchors.

Upon seeing the Jones coming over upon her, the Kellers ported and tried to get as far inshore as possible, putting on all speed. The Jones asserted that by so doing she had whipped her tow across her course, without which she would have shaved by without accident. Against the Sunoco the Jones asserted that her port signal and helm had forced her out of a safe starboard passing and driven her into the tow's water.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (J. Harvey Turnure and William H. McGrann, both of New York City, of counsel), for the George H. Jones.

Bigham, Englar & Jones, of New York City (Leonard J. Matteson and T. Catesey Jones, both of New York City, of counsel), for the Sunoco.

Leo J. Curren, of New York City, for the Kellers.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). [1] Prima facie the Jones stands at fault. Minnesota S. S. Co. v. Lehigh Valley Transportation Co., 129 F. 22 (C. C. A. 6). She left her course, came at least 100 feet in shore, and collided with a tow which was on a steady and obvious course safely on her port hand. The Jones' pilot frankly concedes that he did this because, in a choice of evils, he preferred taking the chance of hitting the tow to risking a collision with a tanker full of explosive cargo. We do not necessarily charge him with fault in making that choice, because, if he had been otherwise blameless, the Jones' peril might excuse what would otherwise be a deliberate tort. As we view the facts, it

is unnecessary to say anything on that score, because there seems to us no reason to doubt the conclusion of the learned District Judge that she was moving at too high speed for the waters she was in.

[2] As is common in such cases, the testimony is in much dispute, and it is impossible to reach a certain conclusion in figures. We should be disposed to question whether her speed was as high as 10 miles, as the judge found. Most of the witnesses put it at 7 and we are satisfied that it was at least as much. Speed is clearly relative to the situation of the ship; what is proper at sea is ordinarily improper in a harbor, and one harbor speed should differ from another. The Jones was moving into crowded waters; besides the Sunoco and the tow, there were several small tugs thereabouts, and she was to pass within 400 or 500 feet of a ferry slip from which at any time a ferry might emerge, and into which another was bound. At such a place and at such a time she was bound to hold herself in reserve against possible miscarriages on the part of any of these vessels.

Not much can be deduced from the fact that she had so much difficulty in checking her way after passing the Sunoco. She had put on what steam she had when she hard astarboarded to escape that vessel, and in that we cannot charge her with fault. We believe, however, that the rate at which she was approaching upset the Sunoco's composure and made her miscalculate the Jones' course and her purpose. For that she was at fault, quite as though it had been the direct cause of the collision. Amid such a tangle of shipping and in such a narrow berth, she should have foreseen that the only safe course was to move at a very moderate speed.

The Jones argues, however, that the Kellers was herself at fault for pulling the tow over to the shore, instead of stopping where she was and signaling her barges to let go their anchors. The Kellers was suddenly confronted by a large vessel bearing down upon her at full speed, suddenly and unaccountably deviating from her course, bent apparently on her destruction. The occasion called for quick action, and should be judged with lenity. We are by no means sure that the suggested course was better than that taken. The assumption that the tug whipped her tow into the course of the Jones is not entirely demonstrated, though perhaps she did. Be that as it may, to hold a master at fault for failing in such an emergency to choose the better part seems to us too severe a standard. In following his in-

stinct to get away as quickly as possible, we think that the Kellers' master acted within the pardonable margin of choice. Therefore we hold that the Jones has not shown herself free from that fault with which prima facie she was chargeable.

The case, therefore, turns upon whether she has shown the Sunoco also at fault, despite the fact that she did not collide either with the tow or the Jones. The Two Sisters, L. R. 1 Pro. Div. 117 (C. A.). The Mayor Gaynor appears by her log to have reached the slip at 7:52, to have backed out at 7:55 and gone in at 8:08. As a number of witnesses testify to the fact that two ferries passed between the tankers, we can only conclude that she was the ingoing one. We think, therefore, that the Sunoco's pilot was right when he said that there was a ferry just off his port bow, to which he blew, and for which he waited. It can only have been the Mayor Gaynor, whatever those on board the Sunoco thought her name. The signal, whatever its primary purpose, was by the pilot's own testimony intended also for the Jones, if she would so accept it. While we regard his intention as immaterial for purposes of navigation, we think it conclusive evidence that at that time he considered the situation a starboard passing, and that the vessels must therefore have been starboard to starboard.

[3] The other evidence corroborates this conclusion. It is agreed by nearly all the witnesses that the course of the Jones was nearer the shore than the Sunoco's. The estimates necessarily vary, but in this they are at one. Her course followed the shore line, and this involved some starboarding as she came up, accounting, perhaps, for the fact that at some period the Sunoco could see her port side. There is some question whether she had yet got in line with the dredged channel. Her pilot and third officer said that she had found the ranges and was in line, but her chief officer said that she had still to starboard a little. If the courses were not absolutely parallel, they were nearly so, and her destination was, moreover, apparent to the Sunoco. The case was a starboard passing, and should have been so treated by the Sunoco, as indeed it was at first.

The Sunoco apparently supposes that there must be an agreement in such a case, as when the duties in a crossing case are to be changed. This is an error; the mutual duties are determined by the positions of the vessels, and may not be varied by agreement; indeed, an offer to vary them is itself

a fault. Since the courses called for a starboard passing, the only proper course for each was to signal and so pass. This was entirely practicable for the Sunoco, as is indeed demonstrated by her original offer. While there was some talk about ledges on her port hand, we attach no significance to it. It was the usual starboard passing situation, and should have been so treated.

Again, the Sunoco argues that, if the bearing of each be fine enough on the other's bow, it is a head-on case. The Victory (The Plymothian) 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; The Amolco (C. C. A.) 283 F. 890. This misunderstands those decisions; they refer only to the angle of the courses—i. e., to what shall be deemed parallel. The bearing of ships on such courses may vary from a degree or less to full eight points when they are abeam of each other, and would be an altogether illusive test.

If the facts be as we say, it is hard to understand why the Sunoco should have signaled for a port passing and followed it with a port helm. The excuse given is that the Jones herself ported after answering the Brooklyn's double blast. This is so unaccountable that we cannot accept it, though she might have ported, to go under the Mayor Gaynor's stern, after the Brooklyn had passed. None of the neutral witnesses, however, saw anything of the kind, and those on board the Jones deny it, including Baeszler, certainly not a partial witness, who said that the ship was under a steady helm till she hard astarboarded. It was an unlikely manœuver at best, unnecessary so far as the distance of the ship from the Mayor Gaynor can be ascertained, and likely to involve a collision, of the danger of which the Jones' pilot was acutely aware as the event showed. Moreover, at his examination before the inspectors, while the Sunoco's pilot did indeed swear to this porting, he said nothing of the second ferry. Then it appeared that, though the Jones had got pretty well in, she ported for no reason whatever. Indeed, no reason was assigned for it, even on the trial. We think that it never happened, but when the Sunoco got no answer, as she supposed, from the other vessel, that she became alarmed, perhaps seeing some portion of the Jones' port bow, which would be possible if the latter was not yet quite on the range. Even so the courses were, as we have said, parallel within the meaning of the rule. At any rate we do not believe that the Jones ported, or that there was an excuse for the Sunoco's signal and helm.

The order was wrong in any case; she should have backed and blown an alarm. A port helm, even a hard aport, would indeed have thrown off her bow after an advance of 2,000 feet about four points, but her stern would still remain on her projected course. She could not so escape; she was moving slowly, and her only safety lay in killing her way or acquiring sternway. But, good or bad, we think the order was not justified by the facts, and that she stands charged with the result.

The Sunoco finally argues that in any event she cannot be liable, because the proximate cause of the collision was the Jones' starboard helm, and that there can be only one proximate cause of a wrong. The Panther, 5 F.(2d) 64 (C. C. A. 2). The doctrine succinctly so stated is easily misapprehended unless applied with caution. It is merely a short way of saying that prima facie the intervention of a subsequent tort-feasor in the train of consequences started by an earlier absolves the first. This is probably ordinarily true, but not if the second wrong and its consequences are fairly foreseeable from the start, 25 Harv. Law Rev. 111–113. Nor is foreseeability necessarily the only test. On that, however, we have no occasion to speak, because here it was clearly within the probabilities that, when the Sunoco signaled her intention to port and followed it by a port helm, the Jones would move off to port with all possible speed. The collision inevitably followed upon that, and so the Sunoco shared as an actor in the result.

Decree modified, to hold both vessels equally liable.