George H. GELE (Mrs. Patricia Kellog Gele substituted in the place and stead of George Gele, deceased), Plaintiff-Appellee-Appellant,

v.

**CHEVRON OIL COMPANY,** Defendant-Appellant-Appellee,

and

B. A. Wilson, Henry Herr and Centennial Insurance Company, Defendants-Appellees-Cross Appellants,

and

The Travelers Insurance Company, Defendant-Appellee-Cross Appellant.

No. 75–3509.

United States Court of Appeals, Fifth Circuit.

June 2, 1978.

Lloyd C. Melancon, New Orleans, La., for Chevron Oil Co.

John F. Fox, Jr., New Orleans, La., for Gele.

Ralph E. Smith, New Orleans, La., for B. A. Wilson et al.

Fred E. Salley, New Orleans, La., for Travelers Ins. Co.

Russell J. Schonekas, New Orleans, La., for Henry Herr.

Before JOHN R. BROWN, Chief Judge, GEWIN and. TJOFLAT, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This is a genuine maritime Donnybrook resulting from a nocturnal collision of the TIKI TOO, a 31-foot pleasure craft, with a structure in the Gulf of Mexico, allegedly belonging to Chevron Oil Company (Chevron). George Gele, who was aboard the vessel, was injured and sued Chevron, B. A. Wilson, as the owner of the TIKI TOO, Henry Herr, who was momentarily the boat's operator at the time of collision, Centennial Insurance Company (Centennial), as Wilson's liability insurer, and Travelers Insurance Company (Travelers), as Herr's alleged liability insurer. True to the traditions of the sea, or more accurately to those who follow the sea to a land based tribunal, all lashed out against each other with the usual cross claims for indemnity, contribution, or whatever lesser morsel could be had. The District Court held that Chevron was solely responsible for the collision. No one, however, is completely happy with the decision. All six parties ask that at least part of the lower court's opinion be reversed. After reviewing the massive record, we reverse in part and remand. In particular, we hold that the TIKI TOO was also at fault in the collision.

### A Flair For Disaster

Several days prior to the tragic event, B. A. Wilson invited Gele, the proprietor of a sporting goods store in New Orleans, to go on a flare fishing expedition.[1] Gele accepted, but when he arrived at the New Orleans marina at the appointed hour on May 29, 1971, he learned that defendant Wilson could not accompany the party as planned. Already aboard the TIKI TOO for the trip, however, were Henry Herr and Stewart Wilson, the 16-year-old son of the boat owner. Gele was accompanied by his minor son Michael and his minor nephew James Gele.

After leaving the New Orleans marina in the early afternoon, the TIKI TOO stopped for bait and ice at a marina on Shell Beach, where Donald Bousquet, an acquaintance of Gele, joined the party. The TIKI TOO then proceeded southeast toward the Gulf of Mexico on the Mississippi River-Gulf Outlet Canal, and eventually arrived while it was still daylight in Chevron's Block 41 Field, Main Pass Area,[2] which is generally south and west of the entrance to the Canal. During this trip, Herr and Stewart Wilson alternated in operating the boat, although Gele said that on certain occasions he would hold the wheel for a few seconds.

At approximately 10:30 p. m., after fishing near several flares, the party decided to move to another flare northeast of their location in the direction of the Gulf Outlet Canal. Herr was in the forward starboard seat at the controls. Stewart Wilson was seated next to him, and George Gele was on the forward port seat making fishing leaders. Donald Bousquet was seated in the aft section of the boat, and the two young boys were asleep in the cabin below. Herr set his course, in the words of the District Court, to "skirt a lighted platform" between the TIKI TOO and the intended new fishing area. The seas were light, the weather was clear, and only the running lights of the TIKI TOO were on at this time. The boat was planing at 15–16 knots when suddenly the starboard bow collided with an object in the water. Although the description of the object varied, members of the fishing party described it in general as a cylindrical piling structure or flare pipe extending 10 to 15 feet above the water. Whatever it was, witnesses agreed it was unlighted and unmarked by any reflective material.

1. At night fish are attracted to the light of gas flares in offshore oil fields. Consequently, fishermen are attracted as well.

2. Block 41 Field, Main Pass Area encompasses some 58 to 60 square miles. The field is named for one of its several component mineral leasing units, which include blocks numbered 40 through 43 and 54 through 59.

The impact of the collision threw Gele against the dashboard of the boat. Four of his lower teeth were broken and his mouth and lips were cut. More importantly, as Gele later learned, he bruised the inner side of his left knee on some object or part of the vessel. No one else was injured.

A quick check for damage revealed that the TIKI TOO was taking water through a split along the chine on the starboard side of the boat. The party stuffed the opening with rags and, with the aid of automatic bilge pumps, the TIKI TOO returned safely to port unassisted. A few days later, Gele was treated by a dentist for his broken teeth and the replacement of upper and lower partial plates. Centennial, the P & I insurer of B.A. Wilson, reimbursed him for the treatment.

Approximately seven weeks after the accident, Gele complained to his family physician about persistent pain in the lower part of his left leg. After Gele failed to respond to medication, he was examined by Dr. Robert Schramel, a vascular specialist, who diagnosed an occlusion of the left popliteal artery behind the left knee, which was evidence of arteriosclerosis. Subsequently, Dr. Schramel performed a bypass vein graft on Gele's left leg in August 1971. A year later another vascular surgeon, Dr. White Gibson, performed an aorto-femoral bypass operation affecting arterial input to both legs. Gele's circulation problems, however, failed to respond to treatment and eventually his left leg had to be amputated above the knee.

The District Court awarded Gele $75,000 in damages to be paid solely by Chevron. Cross claims for indemnity by Chevron against B.A. Wilson, Centennial, Herr, and Travelers and cross claims for indemnity by B.A. Wilson, Centennial, and Travelers against Chevron were dismissed.[3]

### Lost Horizon

■ Chevron argues that it is not liable primarily because the plaintiff never established the precise location or ownership of the object with which the TIKI TOO collided. Chevron points out that at least one witness, in estimating the location of the collision, placed the accident completely outside the Block 41 Field. We hold, however, that the District Court's finding that the flare pipe belonged to Chevron is well above the Plimsoll line of F.R.Civ.P. 52(a).

Chevron holds a blanket permit from the U.S. Army Corps of Engineers for the Main Pass Block 41 Field and is the sole operator in that area. Even without using charts, the field apparently is easy to find. The platforms in the area can be seen off starboard as one approaches the end of the Mississippi River-Gulf Outlet Canal, a well marked, much traveled thrufare. In fact, the entrance to the Canal is within Block 41 Field. The field, moreover, is a favorite of fishermen because it has numerous flares. It is unlikely, therefore, that these fishermen could mistake another field for Block 41.

During the excitement aboard the TIKI TOO following the collision, no one was sure, however, what number was on the nearby platform. Herr, Bousquet, and Stewart Wilson did not remember any signs or writings on the platform, although Gele said that he saw the letters "41" and "Chevron."

Members of the party also gave varying estimates for the number of miles from the Canal at which the accident occurred. Herr, Gele, Bousquet, and Wilson all agreed, on the other hand, that they could see the lights of the Canal from the location of the collision. Herr said that the visibility of a light on this night was from five to six miles. The Judge could find, therefore, that the collision presumably occurred no more than five to six miles south of the Canal which would place it in the Block 41 area.

Bousquet, however, testified that the collision was eight to ten nautical miles from the channel which would be outside the Block 41 field. Bousquet had navigation

---

3. After oral argument on the appeal to this Court, George H. Gele died, and his widow, Patricia Kellog Gele, was substituted as plaintiff-appellee-appellant.

experience in the military, but on this trip he never took a turn at the wheel. He based his judgment, in part, on the fact he could see the lights of the Canal buoys from the collision site. His eight to ten nautical mile estimate, therefore, is inconsistent with Herr's statement that lights could be seen for only five to six miles.

Young Stewart Wilson, in contrast, who along with Herr had shared time at operating the boat, set the site of the collision at two miles to the "right" of the Canal's entrance. According to a chart in evidence,[4] this places the collision in the midst of several Chevron platforms.

Wilson's opinion should be highly regarded because two weeks after the casualty Wilson guided another fishing party directly to a flare pipe in the Main Pass Block 41 Field that had blue paint smudges similar to the blue paint on the hull of the TIKI TOO. The pipe was unlighted and unmarked with reflective material. In addition, George Van Geffen, who was along for that trip, estimated the distance from the entrance of the canal to the flare pipe at five to six statute miles. Although further from the center of activity in Block 41, nonetheless, this location also placed the offending flare pipe within Main Pass Block 41 area.[5]

In sum, although the members of this nocturnal fishing crew could not pinpoint the exact location of the collision within Block 41, we cannot say the District Court was clearly erroneous in concluding that the TIKI TOO collided with a structure belonging to Chevron since the oil company was the exclusive operator in this area.

*Close Encounters Of The Chevron Kind*

With an obstacle in navigable waters, Chevron had a statutory duty to install lights or reflective material. 33 C.F.R. § 67.05–1.[6] If the object was within 100 yards of the platform, regulations require that Chevron mark it with "red or white retro-reflective material." If the object was more than 100 yards away, a light was needed. No one, of course, on the night of May 29, 1971, measured the exact distance between the pipe and the platform, and estimates ranged from 200 feet to 300 yards. Andrew Smith, supervisor of offshore construction for Chevron, said that flare pipes were not supposed to be more than 100 yards from the platforms, in part, to avoid having to maintain a light on them.[7]

Assuming, therefore, that the pipe was within 100 yards and only reflective markers were required, Chevron's failure to mark the structure brings on the Rule of *The Pennsylvania*. When a ship violates a statutory rule intended to prevent collisions, "the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute." *The Pennsylvania*, 1874, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148, 151. The Rule, moreover, is applied, not only to ships, but also to those who do not properly mark an object in navigable waters. *Kaiser v. Travelers Insurance Co.*, E.D.La., 1973, 359 F.Supp. 90, 94, 1974 A.M.C. 1809, 1814, *aff'd*, 5 Cir., 1974, 487 F.2d 1300, 1974

---

4. Chevron Exhibit D.

5. On this second trip, Stewart Wilson again could not remember seeing any markings on the nearby platform. However, Frank Basile, who was also along, testified that the platform had a Chevron emblem and the designation "42–D Main Pass Block." Van Geffen observed a "41 D" and "some other writing."

6. The regulations provide, in pertinent part:
   (e) Lesser structures and piles, pile clusters or flare templates, etc., will not normally be required to be marked by obstruction lights, when they are located within 100 yards of a Class "A", "B" or "C" structure marked by established obstruction lights, but they shall be marked with red or white retro-reflective material, installed as prescribed by the District Commander.

7. R., vol. 2, at 449 (deposition of June 12, 1973). Smith also explained that if the flare pipes were too far from the platforms, pressure would cause the gas to back up, and if the flare pipes were too close, the released gas might drift across the production site. The optimum distance was 300 feet. *Id.* at 450.

A.M.C. 1815; *Chevron Oil Co. v. M/V New Yorker,* E.D.La., 1969, 297 F.Supp. 412, 1970 A.M.C. 514.

The Rule of *The Pennsylvania* is not pressed to literal extremes for it does not go so far as to say that "every vessel guilty of a statutory fault has the burden of establishing that its fault could not, by any stretch of the imagination, have had a causal relation to the collision, no matter now speculative, improbable or remote." *China Union Lines, Ltd. v. A.O. Anderson & Co.,* 5 Cir., 1966, 364 F.2d 769, 782, 1966 A.M.C. 1653, 1669. *See Campania De Maderas v. The Queenston Heights,* 5 Cir., 1955, 222 F.2d 120, 1955 A.M.C. 797, *cert. denied,* 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736, 1955 A.M.C. 2137.[8]

In this case, nevertheless, we hold that Chevron failed to overcome its burden of showing that by all reasonable probabilities its failure to mark the structure did not contribute to the cause of the collision. Although the TIKI TOO had only its running lights on, light from the four corner lights of the platform could have reflected off a properly marked flare pipe to warn the boat of the danger.[9] The TIKI TOO, moreover, was not approaching the platform at an angle at which it would be impossible for light to be reflected from the platform to the boat.[10] The platform was off the vessel's port side when the TIKI TOO's starboard bow collided with the structure. We affirm, therefore, the liability of Chevron.

### The Tiger In TIKI TOO's Tank

■ Both Gele and Chevron contend that those responsible for the operation of the TIKI TOO are negligent. The District Court exonerated B.A. Wilson, the boat's owner. Wilson, however, is held only to a standard of "reasonable care under the circumstances." *Kermarec v. Compagnie Generale Transatlantique,* 1959, 358 U.S. 625, 631–32, 79 S.Ct. 406, 410, 3 L.Ed.2d 550, 555, 1959 A.M.C. 597, 602; *Gibboney v. Wright,* 5 Cir., 1975, 517 F.2d 1054, 1059, 1975 A.M.C. 2071, 2078. Although "a bag of coffee beans fares better than a non-crew member fare paying passenger to whom the warranty of seaworthiness does not run," *Tittle v. Aldacosta,* 5 Cir., 1977, 544 F.2d 752, 755, we believe in this case B.A. Wilson met the reasonable care standard.[11] He was not aboard the TIKI TOO at the time of the collision, and no equipment on the boat malfunctioned which might have contributed to the accident. Neither did Wilson place the vessel at the disposal of inexperienced boat operators.[12] Thus, we affirm the District Court's holding that Wilson is free of personal liability.[13] See *Moye v. Henderson,* E.D.Ark., 1973, 364 F.Supp. 1286, 1291–92, 1974 A.M.C. 178, 188, *aff'd,* 8 Cir., 1974, 496 F.2d 973, 1974 A.M.C. 2661, *cert. denied,* 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125; *In Re Landi's Petition,* S.D.N.Y., 1960, 194 F.Supp. 353, 362, 1961 A.M.C. 690; *The Pegeen,* S.D.Calif., 1936, 14 F.Supp. 748.[14]

---

**8.** See generally Zapf, *The Growth of the Pennsylvania Rule: A Study of Causation in Maritime Law,* 7 J.Mar.L. & Com. 521 (1976); C. Bue, *Admiralty Law in the Fifth Circuit* —a Compendium for Practitioners: II, 5 Houston L.Rev. 767, 798–802 (1968).

**9.** During trial, Andrew Smith, supervisor of Chevron's offshore construction, responded affirmatively to this question: "[The reflective markers] would reflect the lights from the rig, the platform, the structure?" R., vol. 5, at 755.

**10.** Smith note 8, *supra,* described how the flare pipes were marked:
Well, the end of the flare pipe is painted with reflective paint, or wrapped with reflective tape, and most of this material is red, and you wrap it around the top of the pipe. R., vol. 5, at 755.

**11.** See generally E. Vickery, *Special Problems of Personal Injury and Death Arising out of Collision Disaster Cases,* 51 Tulane L.Rev. 896, 907–08 (1977).

**12.** Cf. *Nuccio v. Royal Indemnity Co.,* E.D.La., 1968, 280 F.Supp. 468, 1968 A.M.C. 365 (owner did not exercise reasonable care when he delegated boat operation to inexperienced person).

**13.** No *in rem* complaint was filed against the TIKI TOO.

**14.** See Note, *Pleasure Boat Owner Tort Liability in Admiralty; An Examination of the Limited Liability Act and a Proposal for Reform,* 50 So.Calif.L.Rev. 549, 555 n. 32 (1977).

We disagree, however, with the District Court's finding that no one was at fault in the operation of the TIKI TOO. Although there may be evidence to support such a finding, we have the "definite and firm conviction that a mistake has been committed." *Hess Shipping Corp. v. S.S. Charles Lykes,* 5 Cir., 1969, 417 F.2d 346, 349, 1969 A.M.C. 1787, 1790, *citing, United States v. U.S. Gypsum Co.,* 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. We are compelled to hold the finding clearly erroneous.

Herr was operating the TIKI TOO on a dark night at a planing speed of 15–16 knots in an offshore oil field. He was aware of flare pipes and anchor buoys in the area. In fact, he knew that in oil fields certain small buoys (the size of a 7-to-10-gallon can) may be completely unmarked.[15] Gele even testified he had seen several unlighted flares on the day of the accident, although Herr denies seeing any in the area. Herr, nevertheless, at the time of the collision was attempting to "skirt" a platform at approximately 100 to 150 yards, a distance at which it was common to locate flares.

Herr argues that although the vessel's speed was 15–16 knots, his range of visibility for unlighted objects was 300 feet and the boat would stop in 50 to 75 feet if "you chop your engines completely."[16] The proper rate of speed, however, is relative to the circumstances of the ship. *George H. Jones,* 2 Cir., 1928, 27 F.2d 665, 667, 1928 A.M.C. 1504 (L. Hand, J.), *cert. denied,* 278 U.S. 649, 49 S.Ct. 83, 73 L.Ed. 561; *United States v. S.S. Soya Atlantic,* D.Md., 1963, 213 F.Supp. 7, 19, *aff'd,* 4 Cir., 1964, 330 F.2d 732; J. Griffin, The American Law of Collision 580–82 (1949). Under the circumstances of this case, we believe the speed of the TIKI TOO was imprudent.

Herr's estimated stopping distance, apparently, does not include the reaction time of the vessel's operator. To say that a boat will stop within 50 to 75 feet once the engines are throttled down is not the same as computing the distance the boat might travel from the time the operator first sees an obstacle to the time when the boat finally comes to a halt after the object is perceived to be dangerous and the engines are cut.

The limited time available to react before collision was indicated in Herr's explanation of why he hit a flare pipe if he could see 300 feet. Herr stated that he looked at the bright lights of the nearby platform, and when he looked back into the darkness ahead of the boat, for a "split second" he could not see as far as before.[17] During this "split second," the TIKI TOO, proceeding at over 25 feet per second, collided with the flare pipe. If only a "split second" of momentary night blindness was enough to cause a collision, it is difficult to avoid the conclusion that the speed of the TIKI TOO was excessive, especially in an area of known obstructions. Other lighted platforms in the area produced similar night blindness problems for Herr. Paradoxically, Herr stated that he did not reduce speed when the night blindness struck because he "would never get anywhere" before his vision returned.[18]

In an analogous case in which an oil drilling supply vessel hit an unlighted mooring raft, Judge Ainsworth, then a District Judge, commented on proper speed in an area of known obstacles:

> Despite his knowledge of existing conditions he was traveling full speed ahead, 10 to 12 miles per hour, when the collision occurred. Although this rate of speed may have been safe and even desirable for maneuverability on a calm open sea, it was dangerously unsafe in the area where the presence of the mooring rafts was expected. The question of what is a proper rate of speed is relative to the situation of the ship. Prudence and caution here would have dictated a reduced speed.

15. R., vol. 6, at 543–45.

16. R., vol. 6, at 492.

17. R., vol. 6, at 513.

18. R., vol. 6, at 553.

*Duet v. Delta Marine Drilling Co.,* E.D.La., 1963, 215 F.Supp. 898, 899–900, 1964 A.M.C. 497, 499 (footnotes omitted). *See also The E. Madison Hall,* 4 Cir., 1944, 140 F.2d 589, 591, 1944 A.M.C. 202, 204, *cert. denied,* 322 U.S. 748, 64 S.Ct. 1159, 88 L.Ed. 1579. We hold, therefore, that the TIKI TOO was at fault in the collision.

Since we believe that Chevron and the TIKI TOO were both responsible for the collision, we remand for the lower court to determine the comparative degree of fault for each party and to allocate liability for damages accordingly. *United States v. Reliable Transfer Co.,* 1975, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251, 1975 A.M.C. 541; *Nutt v. Loomis Hydraulic Testing Co., Inc.,* 5 Cir., 1977, 552 F.2d 1126, 1132, —— A.M.C. ——.

### Three's A Crowd?

■ We are confronted, in addition, with determining whether Herr is solely liable for the operation of the TIKI TOO. When friendly fishermen borrow a boat for an evening of piscatorial pleasure, certainly, it would not be uncommon for responsibility to be shared. As one court explained in a similar situation: "The host and guests were common adventurers, much as if two or more together hire a boat. They are both hosts and guests." *Murphy v. Hutzel,* E.D.Pa., 1939, 27 F.Supp. 473, 475.[19] In fact, Herr testified that all members of the party were to participate in the operation of the TIKI TOO.

Stewart Wilson, moreover, claimed that Gele was in charge of the voyage, and Herr explained that he went along only because Gele invited him. The record, however, is unclear on who was the "master" of the TIKI TOO. Gele asserts, for instance, that he did not know who invited Herr, but that Herr and the owner of the TIKI TOO were friends and had fished together on several occasions—all of which Herr denies.

We believe, therefore, that on remand the lower court should determine if any negligence in the operation of the TIKI TOO should be attributed to Gele. If he was the "master" of the craft or part of a joint venture, then he should be held liable for some portion of the negligent operation of the TIKI TOO. See, e. g., *Moye v. Henderson,* E.D.Ark., 1973, 364 F.Supp. 1286, 1292–93, 1974 A.M.C. 178, 187–88, *aff'd,* 8 Cir., 1974, 496 F.2d 973, 1974 A.M.C. 2661, *cert. denied,* 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125. Gele's own negligence, of course, would not bar recovery of damages. It would only reduce the amount of the total award in proportion to his comparative degree of fault. See, e. g., *Kelloch v. S&H Subwater Salvage, Inc.,* 5 Cir., 1973, 473 F.2d 767, 769, 1973 A.M.C. 948, 949.

### Potpourri

■ Travelers, Herr's alleged liability insurer, makes two arguments that deserve comment. First, and somewhat surprisingly since Travelers was home free after final judgment, it contends that the District Court erred in finding any causal connection between the bruise on the knee and Gele's subsequent arteriosclerosis. We disagree. Although medical testimony was unanimous that arteriosclerotic occlusive disease could not be caused by a blow to the knee, it was stated that trauma could accelerate the onset of arteriosclerotic symptoms and that but for the injury to the knee, Gele could have gone longer without vascular problems. Medical expert testimony concerning causation is generally admissible if it states that the "cause produced, probably produced, or might have produced the result." *Robertson v. Douglas S.S. Co.,* 5 Cir., 1975, 510 F.2d 829, 834 n. 2, 1975 A.M.C. 2338, 2344 n. 2. In light of this standard, we affirm the lower court's opinion with respect to the causation of Gele's injuries.

■ Second, Travelers argues that the District Court should have granted its motion to be dismissed from this case. It was named as a defendant under Louisiana's

---

19. *See also Kanischer v. Irwin Operating Co.,* 5 Cir., 1954, 215 F.2d 300, 1954 A.M.C. 1812; *Merrill Trust Co. v. Bradford,* 1 Cir., 1974, 507 F.2d 467, 1974 A.M.C. 2582; *Linehan v. United States Lines, Inc.,* D.Del., 1976, 417 F.Supp. 678, 694.

direct action against insurers statute. La. Rev.Stat.Ann. § 22:655 (West)[20]. Travelers contends that neither Gele nor Chevron proved that the insurance company provided a policy for Herr at the time of the collision. The only evidence, it explains, was Herr's testimony that he had a Homeowner's Policy. *Cf. Gates v. L.G. DeWitt, Inc.,* 5 Cir., 1976, 528 F.2d 405, 410 (plaintiff must prove existence of insurance policy under Georgia's direct action statute).

It is a mild statement for us to say that at this stage we are surprised and baffled by Travelers' plea[21]. The record is imperfect but not such as to permit the seagoing chancellor to inflict on others the decisive dismissal altogether. With Travelers' alleged assured (Herr) being left off the hook, the nature and extent of this admitted policy was unimportant. Now all is changed, and the parties must be free to supply, if they can, the deficiencies.

■ Finally, all defendants are upset with the District Court's dismissal of their cross claims for indemnity. Each one contends that his negligence was only passive, thus, deserving of indemnification. *Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Co.,* 5 Cir., 1969, 410 F.2d 178, 1969 A.M.C. 767. Although the degree of comparative fault of Chevron and the TIKI TOO may prove to be different, both were actively negligent in this collision. In many ways this has gone out of the case. Both Chevron and Herr are held liable, and on principles of *Delta Marine* neither can be regarded as more or less passive or active than the other. Thus, we affirm the dismissal of the cross claims for indemnity as between Chevron and Herr. Travelers, in Herr's sneakers, fares no better. Centennial, while now free of any liability for its assured Wilson, may have some obligation to Herr and others as possible additional assureds so indemnity is not warranted as to it.

This decision, of course, does not affect Gele's right to collect all his damages from one party in the event he is unable to obtain the relative portion of damages from each party at fault. *Empire Seafoods, Inc. v. Anderson,* 5 Cir., 1968, 398 F.2d 204, 217, 1968 A.M.C. 2664, *cert. denied,* 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444. See also E. Vickery, note 10, *supra,* at 935.

In sum, the District Court on remand should (i) specify the comparative degree of fault between Chevron and the TIKI TOO and allocate damages accordingly, (ii) determine if and to what extent Gele himself should be held liable for any of the damages held chargeable to those on the TIKI TOO either as a joint venturer or comparative fault for his own negligence, if any, and (iii) determine the nature and extent of Travelers' and Centennial's[22] coverage for Herr.

**20.** No party challenges the use of the direct action statute, which can be invoked in admiralty cases on Louisiana's "inland" waters, *Continental Oil Co. v. London Steam-Ship Owner's Mutual Ins. Ass'n.,* 5 Cir., 1969, 417 F.2d 1030, 1037, 1969 A.M.C. 1882, 1892–93. All parties apparently agree this is an "inland" waters case.

**21.** Travelers can hardly claim it provides no insurance for Herr. In the Pre-Trial Order, signed by Travelers' attorney, it was stipulated:
    d. THE TRAVELERS INSURANCE COMPANY basically adopts the ultimate contentions of fact of HENRY HERR and CENTENNIAL INSURANCE COMPANY, but will show that at the time of the alleged accident the policy of CENTENNIAL INSURANCE COMPANY provided primary coverage to HENRY HERR whereas the *policy of THE TRAVELERS INSURANCE COMPANY provided excess coverage.* . . . .

7. Facts established by the pleadings:
    Plaintiff, GEORGE GELE, was aboard the Yacht TIKI–TOO, owned by B. A. WILSON, on May 29, 1971, when the vessel came into collision with an unlighted flare pipe in the Gulf of Mexico. CENTENNIAL INSURANCE COMPANY is the liability insurer of B. A. WILSON. *THE TRAVELERS INSURANCE COMPANY is the excess liability insurer of the defendant, HENRY HERR.*
    \*  \*  \*  \*  \*  \*
[11.]c. The Travelers Ins. Co. may use any documents listed by any other party and copies of the Travelers and Centennial policies.
    .  .  .
R., vol. 4, at 932–34 (emphasis added).

**22.** After the trial court permitted Herr's initial counsel to withdraw, counsel for Centennial appeared on behalf of Wilson, Herr, and Centennial. No question appears to be raised that Centennial's coverage is available to Herr.

The extent to which determination of these remanded issues will require additional evidence is left initially to the District Judge.

REVERSED IN PART and REMANDED.