470 F.Supp. 140 (1979)
INGRAM BARGE COMPANY, Plaintiff,
v.
The VALLEY LINE COMPANY, a corporation, Defendant.
No. 77-552A(A).
United States District Court, E. D. Missouri, E. D.
April 24, 1979.
*141 Lucas & Murphy, St. Louis, Mo., for plaintiff.
Thompson & Mitchell, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
HARPER, District Judge.
Plaintiff, Ingram Barge Company, brought this action for damages which it has sustained as a result of a collision on the Illinois River between its tank barge, FLORIDA, and a pair of sunken coal barges owned by the defendant, The Valley Line Company.
The parties stipulated to the fact that plaintiff was the owner of the tank barge FLORIDA and that defendant was the owner of two coal barges, CB-231 and MV-763. It was further stipulated that on February *142 8, 1976, while the tank barge FLORIDA was in tow of plaintiff's tug M/V BILL GEE on the Illinois River, at or near the Mile 187 mark, at approximately 9:45 p. m., it collided with one or both of the sunken coal barges CB-231 and MV-763. Jurisdiction of this Court over this cause of action exists pursuant to 28 U.S.C. § 1333.
The case was tried to the Court. The credible evidence disclosed that on February 2, 1976, the defendant's tug M/V DRESDEN was boarded by Master Pilot Harry S. Clark at the Mile 166.7 mark on the Illinois River. At the time of Clark's boarding the tug M/V DRESDEN it had eight barges in tow. Due to the icy conditions existing on the Illinois River it was decided to "double trip" the eight barges. "Double Tripping" refers to the process of moving four barges of the total of eight through the area to be traveled, then running the four aground, and then returning to the point of origin and picking up the remaining four barges to be moved in a second trip. The tug M/V DRESDEN took the lower four barges of the tow and pushed them to the Mile 187.3 mark on the Illinois River, at which time the M/V DRESDEN proceeded to push the four barges aground on the outside of an island at Sawyer Slough, with the starboard corner of the head barge approximately 150 feet off the island and the starboard stern corner approximately 200 feet off the island. After being run aground the group of four barges was marked with three white kerosene lanterns.
At 1:40 a. m. on February 3, 1976, the M/V DRESDEN departed the Mile 187.3 mark of the Illinois River and proceeded downriver to retrieve the four barges which had been left at the Mile 166.7 mark. At approximately 1:25 p. m. on February 3, 1976, Master Pilot Clark received a radio call from the tug LISA JO and was informed that the barge CB-231 had sunk and that the barge MV-763 was ready to sink. These two barges were part of the group of four barges which had been run aground at the Mile 187.3 mark. Pilot Master Clark immediately notified the office of The Valley Line Company of the condition of the two barges. On February 4, 1976, at approximately 10:35 a. m., Clark, aboard the tug M/V DRESDEN, returned to the site of the grounded barges and confirmed the fact that two of the barges had sunk. The tug M/V DRESDEN then took the two barges, which were still afloat, into its tow and proceeded upriver with a total of six barges in tow.
On February 3, 1976, Captain Beaver, Marine Superintendent of The Valley Line Company, was notified by personnel aboard the tug M/V DRESDEN of the sinking of the two barges on the Illinois River at the Mile 187.3 mark. Captain Beaver notified the Coast Guard in St. Louis of the sunken barges and requested that they (the Coast Guard) mark the barges. For whatever reason, the Coast Guard was unable to mark the sunken barges. However, Captain Beaver was able to make arrangements with the Coast Guard for it to supply to The Valley Line Company an appropriate buoy, buoy anchor with cable and buoy lights for the purpose of marking the sunken barges. The buoy, anchor and lights were to be purchased at the Coast Guard Station located in Peoria, Illinois. Captain Beaver assigned to Rusty Mitchell, an employee of The Valley Line Company in the Joliet maintenance office, the job of picking up the buoy, buoy anchor and buoy lights at the Coast Guard Depot in Peoria, Illinois, Moreover, Captain Beaver delegated to Mitchell the task of marking the sunken barges.
Around 12:00 p. m. on February 7, 1976, Mitchell left Joliet, Illinois, and drove to the Coast Guard Depot located in Peoria, Illinois. Upon arrival, there was waiting for Mitchell a standard red nun buoy. The buoy was approximately seven feet in height, with a cone-like, cylindrical-shaped upper portion, and attached to the top was a lifting ring for the purpose of affixing the lights thereto. Attached to the bottom of the buoy by means of approximately thirty to forty feet of cable was a concrete anchor. There were also two emergency quick flashing red lanterns, which were to be bolted to the lifting ring of the buoy. *143 After the equipment was loaded into the rear of Mitchell's pickup truck, Mitchell and fellow employee, Jay Little, proceeded to Lacon, Illinois. Upon arriving at Lacon the two men proceeded to the Trumbull River Services Office where arrangements were made for transporting the buoy, anchor and lights to the site of the sunken barges. The equipment was transferred to a Trumbull vessel, the LISA JO, and shortly thereafter Mitchell, Little and two Trumbull employees proceeded to the site of the sunken barges. During the trip to the sunken barges Mitchell affixed one red flashing lantern to the lifting ring of the buoy. Upon arriving at the two barges Mitchell boarded the exposed portion of the head barge, the MV-763, in an effort to determine the angle at which the sunken barges were positioned in the river. The two barges attached end-to-end were approximately 385 feet in length, and were positioned at approximately a thirty degree angle with the adjacent island. Knowing the approximate length of the sunken barges and the angle at which they were sitting allowed Mitchell to determine roughly where the buoy needed to be stationed. With the aid of a pike pole the men probed the river bed and located the downriver corner of barge CB-231, which extended furthest into the channel of the river. From that point the men backed their vessel approximately twenty feet into the channel of the river and proceeded to cut the line holding the buoy anchor, thus allowing it to drop into the water. Immediately after the anchor went into the water, Jay Little guided the buoy over the edge of the vessel and into the water. By the time the men finished marking the sunken barges it was approximately 6:00 p. m. and dusk had set in.
On February 8, 1976, at approximately 9:45 p. m., Captain Willard Chandler was on watch as pilot of the M/V BILL GEE, proceeding north on the Illinois River. The BILL GEE was pushing four barges which were arranged in a straight line, with the lead or head barge being empty and the remaining three barges carrying loads. At approximately the Mile 187.3 mark on the river the tow of the M/V BILL GEE ran aground on the sunken coal barges, CB-231 and MV-763. The head barge of the tow, the BATON ROUGE, did not run aground; rather, it was the second barge in the tow, the FLORIDA, which ran aground on the sunken barges. The number one and two cargo compartments of the FLORIDA grounded on the barges, causing the jet fuel contained in the compartments to leak into the river. Chandler tried to back off the barges, but to no avail.
Chandler testified that as he was proceeding upriver he was utilizing the vessel's searchlight for the purpose of spotting any channel buoys and also to assist in determining his distance from the shoreline. Chandler testified that he saw, with the aid of his searchlight, a red nun buoy between 300 and 400 feet off the right, upriver shoreline. As Chandler proceeded upriver his tow was on the right-hand side of the buoy, or the buoy was to his port or left side as his head barge passed the red nun buoy marking the sunken barges. Chandler testified that he did not see any light on the buoy prior to running aground. It wasn't until after the collision, when Chandler went out on the barges to inspect the damage, that Chandler saw the flashing red light atop the red nun buoy. Moreover, Chandler described the frequency of the light flashes as occurring three or four times in a period of approximately twenty minutes.
The credible evidence clearly established that the defendant's sunken coal barges extended into the 300-foot navigable channel authorized and maintained by the Coast Guard. The Valley Line Company's barges, CB-231 and MV-763, were wrecked and sunk in a navigable channel within the meaning of the "Wreck Act", 33 U.S.C. § 409. The sunken barges, so positioned in the navigable channel of the Illinois River, constituted an obstruction to navigation. Under 33 U.S.C. § 409 it was the duty of the Valley Line Company as owner of the sunken barges to mark them as required by the Wreck Act (33 U.S.C. § 409), and the pertinent regulations found in 33 CFR.
*144 The pertinent part of 33 U.S.C. § 409 is as follows:
"* * * And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidently or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; * * *."
The pertinent sections of 33 CFR are:
"62.25-1 General.
"(b) On the Intracoastal Waterway proceeding in a general southerly direction along the Atlantic Coast, and in a general westerly direction along the Gulf Coast, is considered as proceeding from seaward. On the Mississippi and Ohio Rivers and their tributaries the aids to navigation characteristics are determined as proceeding from sea toward the head of navigation although local terminology describes `left bank' and `right bank' as proceeding with the flow of the river. "62.25-5 Colors.
"When proceeding from seaward:
"(a) Black buoys mark the port (left) sides of channels, or the location of wrecks or obstructions which must be passed by keeping the buoy on the port (left) hand.
"(b) Red buoys mark the starboard (right) sides of channels, or the location of wrecks or obstructions which must be passed by keeping the buoy on the starboard (right) hand.
"62.25-25 Light phase characteristics.
"(a) Lights on red buoys or black buoys, if not fixed, will always be regularly flashing or regularly occulting. For ordinary purposes the frequency of flashes will be not more than 30 per minute (slow flashing). For purposes when it is desired that lights have a distinct cautionary significance, as at sharp turns or sudden constrictions in the channel, or to mark wrecks or dangerous obstructions, the frequency of flashes will be not less that 60 per minute (quick flashing).
"62.25-40 Buoys marking wrecks.
"Buoys established by the Coast Guard to mark wrecks are generally placed on the seaward or channel side of the wreck and as near to the wreck as conditions will permit.
"64-01-1 General.
"(a) The owner of a vessel sunk in the navigable waters of the United States who fails to mark the wreck immediately for the protection of navigation with a buoy or daymark during the day and a light at night may, in addition to being in violation of 33 USC 409, be liable for resulting damage to the public. The owner of a sunken obstruction other than a vessel which creates an obstruction to the navigable capacity of any of the waters of the United States may, in addition to being in violation of 33 USC 403, be liable for resulting damage to the public.
"64.01-5 Marking by owners.
"Buoys, daymarks, and lights established by owners of sunken vessels or other obstructions to mark such obstructions for the protection of navigation shall conform to the lateral system of buoyage prescribed by Subpart 62.25 of this chapter. Such markings shall be maintained until the obstruction is removed or the right of the owner to abandon is legally established and has been exercised."
The primary contested issue is whether the defendant complied with the Wreck Act (33 U.S.C. § 409) and the pertinent afore-cited regulations under 33 CFR in the marking of the two sunken barges. The evidence showed that a standard red nun buoy, with an attaching flashing red light, was used by The Valley Line Company to mark the barges. The red buoy, with a flashing red light attached to the top, directed a vessel proceeding upriver to maintain the red buoy on the starboard side of the vessel in order to safely avoid the obstruction [62.25-5(b)]. A red buoy with attaching red light complies with both the specific requirements of 62.25 of 33 CFR *145 and the Coast Guard's Local Notice to Mariners, Special Edition No. 0-76.[1] It was further established by the evidence that the red nun buoy marking the barges was positioned on the channel side of the sunken barges, approximately twenty feet from the channel side, downriver corner of the barge CB-231. Under the circumstances, the Court finds such positioning of the buoy to be in the exercise of good judgment by defendant and to be consistent with the language of 33 CFR 62.25-40.
Turning to the question of whether the red light atop the buoy was operational on the night of the collision, and more specifically whether it was functioning in accordance with 33 CFR 62.25-25 (at a frequency of no less than 60 flashes a minute), the evidence adduced on these issues was extremely contradictory. Plaintiff contends that the evidence showed that while the light may have been functioning on the night of the accident, it was so dim or otherwise obstructed that it was not clearly visible to approaching vessels. Moreover, plaintiff contends that based upon the evidence it is clear that the red light was not flashing at the frequency required by 33 CFR 62.25-25.
The Court finds from the credible evidence that the red light atop the buoy was operational on the night of the collision and of sufficient brightness to be visible to approaching vessels. Rusty Mitchell testified that on February 7th, at approximately 6:00 p. m., as he was leaving the site of the sunken barges he recalled looking back and seeing a blinking light. On February 8, 1976, at approximately 12:30 a. m., some twenty-one hours prior to the collision, Master Pilot Harry Clark was traveling downriver aboard the M/V LUCKETT, in the area of the 187.3 mark of the river. Clark testified that he saw the red light on the buoy and that it was flashing as he observed it from aboard the M/V LUCKETT.
Finally, the most convincing evidence that the red light atop the buoy was operational and sufficiently visible the night of the collision comes from statements of the plaintiff's pilot, Willard Chandler. On the afternoon following the collision, Chandler stated to two Coast Guard officers that prior to running aground he saw a light ahead of him blinking occasionally, but that he thought at the time that the buoy was a stray.
As to whether the red light was functioning at a rate of not less than 60 flashes per minute, the Court finds from the credible evidence that the red light was operating at the required frequency in accordance with 33 CFR 62.25-25. The invoice sent by the Coast Guard to The Valley Line Company billing it for the equipment supplied to mark the sunken barges described the lights in the following terms: "Two emergency quick flashing lanterns." William Catlatt, a pilot for Ingram Barge Company, who was aboard the M/V BILL GEE the night of the collision, riding as an extra pilot to get some experience in ice, was stationed in the pilothouse when the collision occurred, and testified on cross-examination concerning the frequency of the flashes on the red buoy as follows:
"Q When you saw the buoy, sir, how often did the buoy blink?
"A I didn't really count it. It was a constant blink.
"Q Blink, blink, blink, blink, blink, blink, like that?
"A I would say so."
Based upon the above testimony the Court finds that the manner in which the defendant marked the sunken barges complied in every respect with both the provisions of the Wreck Act (33 U.S.C. § 409) and the afore-cited pertinent regulations contained in 33 CFR.
Section 221 of Title 33 U.S.C. provides:
"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or *146 of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."
Captain Chandler testified that he was using his searchlight as an aid to navigation as he proceeded through the Mile 187 area of the Illinois River. Moreover, Chandler admitted to having seen with the help of his searchlight a red nun buoy between 300 and 400 feet off the right-hand upriver shoreline. While Chandler testified that he did not see any red light atop the red buoy prior to running aground, statements made by Chandler to Coast Guard Officers, Richard Huse, Jr., and Robert Cordz, on the day following the accident reflect the direct opposite. Chandler state to Huse and Cordz that he saw a red light ahead of him blinking occasionally; however, he thought that the red buoy was a stray floating down from upriver. In an effort to avoid hitting the buoy, Chandler maneuvered his tow to the right of the red buoy, in violation of 33 CFR 62.25-5(b). Immediately thereafter, the second barge in his tow, the tank barge FLORIDA, ran aground on the sunken barges owned by defendant.
33 CFR 62.25-5(b) provides that vessels proceeding in the direction of plaintiff's tow (or "from seaward"), must pass a red buoy marking an obstruction in the channel, with the buoy on the starboard or right-hand side of the tow. In the present case the evidence clearly showed that at the time the barge ran aground of the sunken barges the M/V BILL GEE was to the right of the red buoy marking the sunken barges, and thus on the wrong side in contravention of 33 CFR 62.25-5(b).
While the sunken barges protruded into the 300-foot navigable channel authorized and maintained by the Coast Guard, Chandler testified that there was plenty of room to go to the other side of the red buoy. This fact is further substantiated by the evidence that numerous tows passed to the left of the buoy without encountering any problems during the period of February 8th through February 11th while the damaged barge FLORIDA was being worked off the sunken barges. Moreover, Chandler acknowledged that upon seeing the red buoy and having doubts as to whether or not it was a stray, he could have easily radioed either the Coast Guard or a vessel traveling in the area and inquired as to information regarding the buoy. Nevertheless, Chandler chose to take no precaution whatever and to proceed on the rather risky assumption that the buoy was a stray.
As justification for the conduct of Chandler plaintiff argues that the icy conditions which existed on the river at the time of the collision caused many buoys to be off stationed and out of position. As a result, plaintiff contends that a navigator cannot rely on buoys in navigating a river, but rather, fixed aids to navigation, objects on the shore and other sources of navigational information must be utilized. In support of its contention plaintiff cites the following language from 33 CFR 62.25-55:
"All mariners are cautioned not to rely solely on buoys for navigational purposes because of their potential unreliability. Individual buoys have varying degrees of reliability because of the factors described below.
"(a) * * * The mariner is also cautioned that buoys are liable to be carried away, shifted, capsized, sunk, etc. Lighted buoys may be extinguished or sound signals may not function as the result of ice, running ice, or other natural causes, collisions, or other accidents.
"(b) So as not to endanger the safety of his vessel, a mariner is cautioned that he must not rely completely upon the position or operation of buoys to determine the position of his vessel. A prudent mariner also utilizes bearings or angles from fixed aids to navigation and objects on shore, when available, as well as other sources of navigational information such as soundings, RDF, etc. * *."
This Court cannot agree with plaintiff. The fact that icy conditions on the river may cause some buoys to be off station and out of position does not warrant an *147 absolute disregard of buoys as an aid to navigation. There is no evidence which even suggests that because of the icy conditions on the river at the time of the accident pilots were outright ignoring buoys as an aid to navigation. The afore-cited regulations do not advocate that buoys be ignored; rather, they point out that buoys cannot be the sole source of navigational aid because of their potential unreliability.
In The Pennsylvania, 86 U.S. 125 (19 Wall 125), 136, 22 L.Ed. 148 (1873), the Court said:
"The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of the collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."
This rule, often referred to as the Pennsylvania rule, is long settled law, and has been consistently followed. See Gele v. Chevron Oil Co., 574 F.2d 243 (5th Cir. 1978); Three Rivers Rock Co. v. M/V Martin, 401 F.Supp. 15 (E.D.Mo.1975); Complaint of Wasson, 495 F.2d 571 (7th Cir. 1974). In the present case, this Court finds that the rule of The Pennsylvania is applicable, but that it is not apposite with respect to the defendant in view of this Court's finding of no breach of a statutory duty on the part of defendant in marking the sunken barges. Rather, the Rule has application with respect to the plaintiff on the basis of this Court's finding that the plaintiff's vessel was proceeding in direct contravention of its statutory duty under 62.25-5(b). The plaintiff has failed to establish here that the failure to follow the directions of the buoy could not have been a cause of the accident. In the absence of a finding of negligence or a breach of a statutory duty on the part of defendant, the plaintiff's statutory fault must be the sole cause of the accident.
Accordingly, the Court finds in favor of the defendant.
NOTES
[1] Second Coast Guard District, Local Notice to Mariners, Special Edition Number 0-76, provides, at page 17: "QUICK FLASHING LIGHTS MARK SUNKEN WRECKS * * * They are colored green for right bank hazards and red for left bank hazards."